CITY OF CLEVELAND *v.* HURWITZ ET AL.

(Nos. 729402, 729404, 729830 and 729831—Decided July 25, 1969.)

Probate Court of Cuyahoga County.

*Mr. Jonathan S. Dworkin, Mr. Donald J. Guillar, Mr. William D. Moore* and *Mr. Timothy D. Cotner,* for plaintiff. *Mr. David Ralph Hertz,* for defendant Hurwitz.

*Mr. Otto Miller, III*, for defendants Southwestern Savings & Loan Co. et al.

*Mr. Matthew A. Zidar* and *Mr. Henry DuLaurence, Jr.*, for defendants Hough-East Eighty-Fifth Street Co. et al.

*Mr. Milton Schulman*, for defendant Gumprecht.

BARTUNEK, J. This matter comes before the court upon a consolidation of four appropriation cases for the single purpose of determining the date of take, or in other words, the date of valuation of certain properties being taken by the city of Cleveland for urban renewal purposes.

Under ordinary circumstances, the date of take of a property being appropriated in Ohio is the date the jury is impanelled in the trial to determine the amount of just compensation due to the owner for the taking of his property. Under certain conditions, however, the date of take may be reverted to some date preceding the jury trial, providing it can be shown that the acts of the appropriating authority brought about a *de facto* taking of the property prior to the *de jure* taking as of the trial date.

The evidence in these cases showed that following a survey of slum and blighted conditions in the area surrounding the now Case-Western Reserve University campus and extending westward therefrom, the city of Cleveland, on November 15, 1960, prepared an urban renewal plan for that area which was designated as the University-Euclid General Neighborhood Renewal Plan, Ohio R-32 (GN), encompassing some 1633 acres roughly bounded by Superior Avenue and Wade Park Avenue on the north; the New York Central Railroad tracks on the east; Carnegie Avenue and Cedar Avenue on the south; and East 55th Street and East 79th Street on the west.

Because of the immense size of this project, being only one of Cleveland's seven projects, as compared with total urban renewal programs of 1787 acres in Chicago, 1332 acres in Detroit, and 1003 acres in St. Louis, the city divided this project into four project areas, with the first project area, Phase I, consisting of 863 acres including generally the Case-Western Reserve University campus

extending westward to East 85th Street and East 90th Street between Superior and Chester Avenues. This Phase I area was designated as the University-Euclid General Neighborhood Renewal Plan, Project 1, Ohio R-44.

Although this project was scheduled to proceed in four stages, the data for the plan, including maps of acquisition properties, street relocations, utility relocations, and other significant information were presented in the detail normally required for the full 1633-acre program, and the succeeding phases were scheduled to begin within eighteen-month intervals, with the entire plan to be completed within nine and one-half years.

Following the initial publication of the plan, a public hearing was held before the Cleveland City Planning Commission on December 30, 1960, and on January 27, 1961, the planning commission found that the area in the University-Euclid GNRP, Ohio R-32 (GN) was blighted, deteriorated, or deteriorating and adopted that plan, as well as the Phase I project of that plan, known as University-Euclid GNRP, Ohio R-44.

The final project report as approved by the Cleveland City Planning Commission was formally announced by the city of Cleveland on May 1, 1961, and all of the significant data were determined as of that date.

Later, on June 12, 1961, the Council of the city of Cleveland adopted Emergency Ordinance No. 1338-61, approving the plan recommended by the City Planning Commission because of "the existence of slum and blighted areas and conditions menacing the public health and safety of the citizens of Cleveland . . ."

On April 6, 1965, the city of Cleveland caused to be recorded in the Cuyahoga County Miscellaneous Records the University-Euclid Official Urban Renewal Plan, Ohio R-32 (GN) covering the full 1633-acre site, and also the University-Euclid Urban Renewal Project 1, Ohio R-44, the 863 acre Phase I project.

All of the properties concerned herein were located in Phase III of the University-Euclid GNRP, Ohio R-32 (GN) and were scheduled for acquisition since the first in-

ception of the plan, but no further action was taken by the city in respect to these properties until the Cleveland City Planning Commission, on June 7, 1968, recommended that these and other properties be acquired for a Hough Multi-Purpose Center, a re-use totally different from the original re-use scheduled for these properties since November 15, 1960. This new recommendation was swiftly approved by the Cleveland City Council with the adoption of Emergency Ordinance No. 1287-68 on July 15, 1968.

The Hurwitz property located at 1709-11 East 85th Street, just north of Hough Avenue, on May 1, 1961, the date of the public release of the official documentation of the University-GNRP, Ohio R-32, consisted of a six-suite frame apartment building, more or less fully occupied and producing a reasonable income for the owner. Today, the structure has been demolished and there exists only a vacant piece of land producing no income to the owner.

Located at 8409-11 Hough Avenue, the Southwestern Savings and Loan Company property, on May 1, 1961, consisted of a three-story brick six-suite apartment building with two store units and a two-family frame dwelling, which were more or less fully occupied and which were producing a reasonable income for the owner. Today, the structures have been demolished and there exists only a vacant piece of land which is not producing any income to the owner.

On May 1, 1961, the Hough-East Eighty-Fifth Street Company property located at 8503 Hough Avenue and 1717-23 East 85th Street, consisted of a four-story brick 32-suite apartment building, more or less fully occupied, producing a reasonable income for its owner. Today, it is vacant and vandalized and boarded up, producing no income to the owner.

The Gumprecht property, located at 8415 Hough Avenue and 1722 East 85th Street, on May 1, 1961, consisted of a three-story brick 13-suite apartment building which was more or less fully occupied and producing a reasonable income for its owner. Today, it is vacant and vandalized and boarded up, producing no income to the owner.

The changed condition of these properties appears to

be typical for the neighborhood. Witnesses for the landowners and the city seemed to agree that the Hough area in the vicinity of the subject properties was, in 1960, a nice residential neighborhood, with fine local merchants, and generally in good condition. And they further agree that today, the neighborhood is in a shambles, the fine local merchants have removed their businesses elsewhere, and the residents who formerly kept the properties up have been replaced by rural southerners, who show little or no respect for the maintenance of property or sanitary conditions.

The witnesses, however, sharply conflict as to the cause of these changed conditions.

Real estate experts for the landowners testify that the adoption of the urban renewal plan itself caused the deterioration of the properties by frightening away stable tenants and others who had previously been investing in the area. This created vacancies, they said, and people moved out of the area in platoon-like droves in 1961, 1963, 1965, and again in 1966.

Testifying for the city, real estate experts stated the announcement of the urban renewal program had no effect on the area, but blamed the land contract system of buying properties which resulted in too high monthly payments leaving the purchasers no funds available to maintain their properties which consequently became progressively deteriorated, vacated, and then vandalized.

However the disagreement as to cause, there was no doubt that the Hough area drastically declined into a seething hotbed of discontent which culminated in the Hough riots in July 1966, utterly destroying the last remnants of the fine residential neighborhood Hough once had been.

Owners testified as to the frequent meetings called by city officials to apprise them of plans for the entire Hough area. They further told about the frequent building code inspections, followed by a policy of non-enforcement, succeeded by a policy of over-enforcement, which led to the wholesale demolition of structures in the area. And although the city officials testified that there had been no such policies, testimony before the United States Civil

Rights Commission, as well as copies of communications from the city, showed that there had been such programs carried out by the city at various times.

Former residents in the neighborhood told the story of the rapid decline: vandals stripping property of everything in value, including radiators, plumbing and entire furnaces; wineheads occuping vacated houses owned by the city; garbage and rubbish littering the premises; rats boldly occupying the area; and unthwarted crime running rampant on the once peaceful streets.

But city officials countered by stating that no city services were withdrawn in Hough. Indeed, they said, police and fire protection had been increased, garbage and rubbish collections had been intensified, and rat control programs initiated.

But whatever was done was not enough. By the end of 1963, financial institutions were refusing all loans in the area, fire insurance companies were cancelling their policies, and real estate tax valuations were being reduced, reduced, and then reduced again. This was the result of the "dead hand of urban renewal" as one mortgage banker testified. This was the characterization of the urban renewal plan as "urban destruction" as one resident told the United States Civil Rights Commission.

Before we seek to place the responsibility for the devastation of these properties which are the subject of this action, let us first examine the law that pertains to these matters.

Other state jurisdictions have held under similar circumstances, as did the Florida Court in the 1963 case of *State Road Department* v. *Chicone,* 158 So. 2d 753, as follows:

"The value of property at time of taking as depreciated or depressed by prospect of condemnation is not proper basis for measure of compensation for property taken; compensation should be based on value of property as it would be at the time of taking if it had not been subjected to debilitating threat of condemnation and was not being taken."

See also *In re Urban Renewal, Elmwood Park Project*

*a. k. a. Detroit* v. *Cassese,* 376 Mich. 311, and *Buffalo* v. *Strozzi,* 283 N. Y. S. 2d 919.

A federal court, too, in the case of *California* v. *United States,* 151 F. Supp. 570, concerned itself about a taking of property without an actual appropriation, where the court, in 1957, held:

"The actual taking of property as a direct and foreseeable consequence of an intentional and deliberate act by the government may constitute a compensable taking under the law of eminent domain, though government did not expressly intend by its acts to appropriate the specific property."

Other federal courts have agreed as is set forth in *Foster* v. *City of Detroit,* 254 F. Supp. 655, and to some extent *Sayre, Trustee,* v. *United States,* 18 Ohio Misc. 23, a local federal decision, which differs from the above only by requiring an intent to do the act which naturally results in the taking of the property.

In Ohio, early cases such as *Martin Barriss Co.* v. *City of Cleveland,* 17 Ohio Law Abs. 634; *Smith* v. *Erie Rd. Co.,* 134 Ohio St. 135; and *Cleveland* v. *Kacmarik,* 17 O. O. 2d 135; led to the 1963 landmark decision of *Cleveland* v. *Carcione,* 118 Ohio App. 525, which held:

"Where the value of a parcel of property appropriated for an urban renewal project has depreciated because of the action of the urban renewal authority in the appropriation of surrounding property and the destruction of the buildings thereon, with the attendant loss of income to and deterioration of property remaining in such neighborhood, the owner of such parcel is entitled to that compensation therefor which reflects the value of such property *before* its depreciation in value caused by such urban renewal project—*i. e.,* the fair market value thereof immediately before such urban renewal authority took active steps to carry out the work of such project which to any extent depreciated the value of such property."

And this decision has been approved and cited by the 1966 case of *City of Cincinnati* v. *Mandel,* 9 Ohio Misc. 235 and *Bekos* v. *Masheter, Dir. of Hwys.,* 15 Ohio St. 2d 15, decided in 1968.

But still, these Ohio cases do not seem to apply to the facts of this case as forcefully as they do in the *Carcione,* *Mandel* and *Bekos cases,* where the depreciation of the properties was caused solely by the demolishing of the other buildings in the area. Here, we find demolition in the area, but not total and absolute demolition. As it is suggested in other cases, here we find intention to do acts, but certainly no intention to do acts to depreciate the value of the property in the vicinity. So we must look to the other factors.

In these cases, the City of Cleveland announced officially an urban renewal program involving these properties on May 1, 1961. Subsequently, the city began to undertake that program in the same GNRP area, but in a project phase not including the subject properties, and in fact has not yet completed the initial phase begun so many years ago.

In the meantime, spurred by new stories of urban renewal programs, plagued by demolition in the area, bewildered by the on-again, off-again building code enforcement, disturbed by the lack of adequate garbage and rubbish removal, harmed by poor police protection, and continually confused by promises of progress of the urban renewal program in its area, a neighborhood is rapidly accelerated into demise. Under these circumstances, then, the property later acquired for urban renewal purposes, must be valued prior to the cumulatively devastating effects of these acts of the city, and not of the time of the trial of the taking of this property years later.

In other words, when a city makes a commitment to include certain properties within an urban renewal program and sets forth its public intention to acquire these properties for such purposes, and then allows, for any reason, other acts to be committed which cause the property to deteriorate at an accelerated pace, which would not have happened, had the city not undertaken the other phase of the urban renewal program, then the city must pay for the value of the properties before these acts have their debilitating effect.

Armed with the awesome power to take property

against the will of its owner, the city must exercise that power with diligence and with concern, for to do otherwise would destroy the true meaning of the Fifth and Fourteenth Amendments to the United States Constitution. And if it does do otherwise, then the city must pay for its disdain for the rights of others.

The central issue here is not the willful or intentional acts of the city, it is the natural and probable consequence of the acts or the failure to act on the part of the city. It is the cumulative result of many things, each in itself that might not have been totally harmful, but when impacted all together, have the full force of destruction of the property which must be compensated therefor.

For those reasons, then, it is the finding of this court that the taking of the Southwestern Savings and Loan Company property, the Hough-East Eighty-Fifth Street Company property, and the Gumprecht property occurred on the 31st day of August 1965, and the court hereby orders that these properties be valued as of that date for the purposes of the taking herein.

In respect to the Hurwitz property, although the attorney for Mrs. Hurwitz withdrew from the consideration of this court certain elements of the evidence important to this decision, and although Mrs. Hurwitz herself testified that the sole cause of the deterioration of her property was the Hough riots, we find the evidence as to the August 31, 1965, taking so overwhelming, that we place the date of taking of the Hurwitz property also on August 31, 1965.

Separate trials to determine the amount of just compensation due to the owners herein will be scheduled accordingly.

*Judgments accordingly.*