In re Appropriation of Property of Bunner.

(No. 707201—Decided July 29, 1971.)

Probate Court of Cuyahoga County.

*Mr. Milt Schulman*, for Bunner, the property owner.
*Mrs. Rita Page Reuss*, for state of Ohio.

Bauer, J.    This cause came on to be heard upon the motion of the property owners requesting the court to set a date of valuation of the subject property for appropriation purposes.

This court conducted an evidentiary hearing on the issue of date of valuation, at which the parties presented considerable testimony and exhibits.    Further, the court heard arguments of counsel, and the parties submitted extensive briefs outlining their positions.

The state of Ohio, through the State Highway Department seeks to appropriate the subject property, which is located on Wade Avenue in the city of Cleveland between West 32nd Street and Fulton Road.    This property lies directly in the right-of-way of proposed Interstate 90, a four-lane highway, which will pass through the southerly part of the city of Cleveland in an east-west direction.

The Wade Avenue area, as it existed in 1962, was one of Cleveland's oldest and most stable neighborhoods.    The

residents. were primarily middle-class ethnic people who had lived in the area, often in the same house for many, many years.

The Bunner property was a house consisting of three rental suites and a first floor office. It was forty to fifty years old and was of like age as the other houses in the area.

Dr. Bunner died in June, 1965. At that time he was engaged in remodeling the first floor for his office. At the time of his death, the property was occupied by stable tenants, who had occupied their suites for a long period of time prior to Dr. Bunner's death. These tenants remained in the property through approximately October, 1965, and paid rent during the entire period.

Although many of the other homes, both on Wade Avenue and on the other streets in the immediate area, contain more than one suite, almost all homes were owner-occupied. The extra suites were most often occupied by the close family or other relatives of the owner. This, of course, was not the case with the Bunner property.

The State Highway project to construct Interstate 90 was publicly announced in 1959. It was a very controversial project, and large numbers of residents in the path of the proposed right-of-way (or near to the right-of-way) voiced strenuous objections. The project received widespread newspaper publicity from 1959 through approximately 1965. Numerous public meetings were held. The highway was the subject of great controversy.

As early as 1959, the State Highway Department designated the proposed center line and right-of-way. Pictures of the right-of-way were displayed not only at the public meetings, but in the many newspaper stories concerning the project. The right-of-way was changed very little during the entire period.

.. The Bunner property was located directly in the middle of the right-of-way. The right-of-way ran generally in a west to east direction on Wade Avenue and on Vega, the street immediately to the north. An interchange was designated immediately east of West 25th Street, which is approximately 1-½ blocks from the Bunner property.

In 1963 and 1964, the State Highway Department purchased the areas necessary for the construction of the interchange at West 25th Street. As indicated, these properties are approximately 1-½ blocks from the Bunner property.

During the period 1963-1964, the State Highway Department purchased other properties along the right-of-way between West 25th and West 45th Street. At least three properties were purchased during that period. Further, the State Highway Department sent surveyors into the area to lay out the proposed right-of-way. Testimony indicated that they were surveying in the area of the Bunner property at least once, and probably twice.

The court finds that as a result of the considerable newspaper publicity, and as a result of the activities of the State Highway Department in the area, it became common knowledge in the community that Interstate 90 would come through the area, and that the properties on the block bounded by Wade Avenue on the south and Vega on the north would be purchased. Certainly, this was common knowledge as early as January, 1965.

In January 1965, the Highway Department purchased the Dulack property, a house only a few doors from the Bunner property. Mr. Draus, who was the official in charge of the right-of-way purchases, testified that one reason the Highway Department purchased the property was to keep it from falling into the hands of land speculators. The sale of the property was first proposed by the executor of the owner's estate. He called the State Highway Department to find out if they would purchase the property. The Dulack property was demolished by the State Highway Department in August 1965.

In August 1965, the State Highway Department opened a relocation office in the neighborhood of the Bunner property. The purpose of this office was to find homes for people in the neighborhood who were moving out of the way of the coming freeway. The opening of this relocation office was even publicized in the newspapers.

Dr. Bunner died in June 1965. In July of that year, an administratrix was appointed for his estate. Mr. Ken-

neth Preston, attorney for the administratrix, attempted to list the property with real estate brokers. No real estate broker would take a listing for the property, since it was in the path of a freeway. One real estate broker, however, offered to negotiate a sale of the property to the Highway Department. He and Mr. Preston went to the state's relocation office and tried to negotiate a sale of the property to the state. The state, however, made no effort to purchase the property until the middle of 1966.

In October and November, 1965, Mr. Charles Braman, an appraiser for the State Highway Department, began appraising properties on the block which contained the Bunner property. His appraisals at that time were made on Vega Avenue, the street immediately north of Wade Avenue.

In November and December, 1965, the stable tenants who until that time had occupied the Bunner property, moved out. The administratrix of the Bunner estate was unable to obtain other tenants. The property was occupied from time to time by "squatters" and other people who moved in and out and most often did not pay rent.

These "squatters" inhabited the property in December and January, 1966. By February 1966, the property was completely vandalized. The administratrix had the property boarded up.

The court finds that the unsalability of the property as early as July and August, 1965, and the unrentability of the property in October, November and December, 1965, resulted from the public knowledge in the immediate area that the State Highway Department would very shortly begin appropriation proceedings to condemn the property and demolish it.

The court finds that beginning in July and August, 1965, the property was affected and the owner's rights in the property limited solely by reason of the activities of the State Highway Department in the area.

The court finds that beginning in July and August, 1965, the property began to decline in value both for sale and rental purposes solely by reason of the fact that it was in the path of an imminent acquisition by the State High-

way Department and because this fact was of common knowledge in the community.

The chain of events that resulted in the destruction of the Bunner property is not uncommon in situations of this sort. Many courts have had occasion to comment on the inevitable chain of events that follows the announcement of a large public project:

"In some programs property values may decrease because of preliminary actions by the public officials, or the announcement of a proposed project and the prospect that the property probably will be taken for the project. Where this occurs several years before the actual taking, especially in urban areas, tenants move out or fail to renew their leases and new tenants cannot be obtained, buildings are abandoned, the neighborhood deteriorates or is deserted and vandalism sets in. By the time the property is taken values frequently have decreased sharply." *In re 572 Warren St.* (1969), 298 N. Y. S. 2d 429.

"A public announcement of a planned project may result in tenants moving out * * * land may become unsalable * * * maintenance of land and buildings may cease * * * and police protection may cease, thereby encouraging vandalism. * * *" *Udovich* v. *Arizona Board of Regents* (1969), 453 P. 2d 229.

"The first neighborhood acquisition under the program in this case was May, 1961. The first demolition was in January, 1962 * * * (T)he neighborhood began to deteriorate. Following the movement of residents, vandalism, rodent damage, and fires depreciated properties in the vicinity of and including appellees' property. One of the land owners testified that the appellees' duplex was a rental property and that the last tenant left in July or August, 1962. * * * When the last tenant left, appellees had the duplex boarded up, but it was almost immediately vandalized and the interior badly damaged." *Becos* v. *Masheter* (1968), 15 Ohio St. 15.

"The changed condition of these properties appeared to be typical for the neighborhood. Witnesses for the landowner and the city seemed to agree that the Hough area in the vicinity of the subject properties was, in 1960, a nice

residential neighborhood with fine local merchants, and in generally good condition. And they further agreed that today the neighborhood is in a shambles, the fine local merchants have removed their businesses elsewhere, and the residents who formerly kept the property up were replaced by rural southerners, who show no respect for the property or sanitary conditions. * * *

"Former residents in the neighborhood told the story of the rapid decline; vandals stripping property of everything of value including radiators, plumbing, and entire furnaces; wineheads occupying vacated houses owned by the city; garbage and rubbish littering the premises; rats boldly occupying the area; and unreported crime rampant on the once peaceful streets." *City of Cleveland* v. *Hurwitz* (Probate Court, Cuyahoga County, 1969), 19 Ohio Misc. 184.

The conditions described above became more pronounced in 1966. They were, however, in motion in 1965, and the Bunner property, since it was occupied by tenants and not by the owner, was one of the first properties to be affected.

The question before the court is what date should be established as the date for valuing this property for appropriation purposes. The court must apply the general rule of law that a property must be valued for condemnation purposes independent of any effects of its value which are attributable to the project itself.

As a general principle, the owner is entitled to be compensated for the value of that of which he has been deprived only. He is *not* entitled to receive any *enhanced* value which accrues to his property by reason of the proposed project. Absent the project, his land would not be condemned, and the courts have held that the land owner is not entitled to consideration of the increased value which would result from the presence of the project. *Akron* v. *Alexander*, 5 Ohio St. 2d 75.

Similarly, the owner is not made to suffer any *decreases* in value which result from the presence of the project. This is the law of Ohio:

"The rule of law is well established, in Ohio and else-

where, that the fair market value of property appropriated, which property is part of a program for improvement by a public body, cannot be enhanced by the value of such improvement to it. * * *

"The reverse of such situation—the depreciation in value of a parcel of property at the time appropriated, where the property is included in a general plan of condemnation to carry out a specific program of the condemnor—is analogous in principle and should, we believe, invoke the application of a parallel rule of law." *City of Cleveland* v. *Carcione* (Court of Appeals, Cuyahoga County, 1963), 118 Ohio App. 525; see also *Becos* v. *Masheter, supra.*

This rule is grounded on general equitable principles. If the owner is not permitted to benefit from the presence of the proposed governmental activity, then he should not be made to suffer from its effects. The property is to be valued *independent* of any effect related to the proposed project. The purpose of this rule is "to exclude depreciation or appreciation due to delays in public projects. * * *" *Becos* v. *Masheter*, 15 Ohio St. 2d at p. 19. This is the holding of the *Becos case*; it is recognized in many other jurisdictions; and it is regarded as the *general* rule. "Inverse Condemnation," Real Property, Probate and Trust Journal, 1968, page 174. See cases cited in: *Udovich* v. *Arizona Board of Regents* (1969), 453 P. 2d 229; *Buffalo* v. *Geo. Irish Paper Co.* (1969), 229 N. Y. S. 2d 8; *In re 572 Warren St.* (1969), 298 N. Y. S. 2d 429. Indeed, the proposed draft of the Model Eminent Domain Code, prepared by the Committee on Condemnation Law of the American Bar Association provides: "Any change in the fair market value (of real estate) prior to the date of condemnation which the condemnor or condemnee established was substantially due to the *general knowledge of the imminence of condemnation*, other than that due to physical deterioration of the property within the reasonable control of the condemnee, shall be *disregarded* in determining fair market value." 2 Real Property, Probate and Trust Journal, (1967), 365 at p. 381. (Emphasis supplied.)

The cases which have considered this doctrine have

never required that a particular combination of activities present in these cases negates any suggestion that a particular combination is required. In *City of Cleveland* v. *Carcione, supra*, for example, the main activities of the condemning authority were the initiation of the project, the demolition of properties in the area, and the notification of tenants to move. In *City of Cleveland* v. *Hurwitz* (1969), 19 Ohio Misc. 184, a case recently decided in this court, the main activity was repeated statements by public officials in the newspapers that the urban renewal program would soon begin. Other activities in that case were increased building inspections, demolition of scattered buildings in the area, and inadequate garbage collections.

In other cases applying the doctrine, the only activity by the condemning authority was the initiation of the project. In *City of Buffalo* v. *Strozzi* (1963), 283 N. Y. Supp. 2d 919, the subject property was destroyed by a fire during the period of the condemnation proceedings. The court held that the owner should not be required to bear the burden of any loss occurring during the delay in the appropriation.

There is no particular combination of actions, or magic formula of "active steps," required to invoke the principle. The question is not whether a particular action was an "active step." Rather, the question is whether the steps which the condemning authority *did in fact take* have had a depreciating effect on the property. The owner is entitled to have his property valued as of the day it began to depreciate, where that depreciation was related to the proposed public project. The *Carcione* and *Becos* cases stand for this principle. The question is not whether the subject property has been depreciated due to the imminence of the proposed project. As the court stated in *Becos*, the purpose of the rule is "* * * to exclude depreciation or appreciation due to delays in public projects."

Courts which have considered this specific issue have emphasized that the important fact to be ascertained is the date on which the property's value began to change by reason of the proposed improvement. As the court stated in

*Tharp* v. *Urban Renewal* (1965), 389 S. W. 2d 453 at p. 456 (Kentucky):

"We adhere to the rule that the property owner is entitled to the value of his property taken by condemnation as of the taking date; however, we have recognized the corollary rule that the 'before' valuation date is at the time before it was generally known that the public project would be performed. * * * The rationale for the rule is that the land owner is not to be penalized for any depreciation in value attributable to the public's learning of the condemnation nor is the condemnor to be required to pay for any enhancement in value which may be attributable to the proposed project."

See also *Commonwealth of Kentucky* v. *Elkin*, 420 S. W. 2d 688.

The recent cases on this subject such as *Tharp* and *Elkin, supra*, have recognized that the property value will alter from the time the public has knowledge of the proposed condemnation.

The Model Eminent Domain Code, which has converted the common law rule into statutory form has confirmed this:

"Any change in the fair market value (of real estate) prior to the date of condemnation which the condemnor or condemnee established was substantially due to the general knowledge of the imminence of condemnation * * * shall be disregarded in determining fair market value." 2 Real Property, Probate and Trust Journal, 365 at p. 381.

The "active steps" of the condemning authority are not the sole element of the project which may affect property values. *Public knowledge* of the project and the actions and beliefs which that knowledge generates will also have an effect. In other words, while the condemning authority's "active steps" may affect property values, public knowledge and anticipation of the project will *themselves* affect property values, even without any substantial "active steps." The process by which public knowledge of the impending condemnation changes property values is detailed in the following quotation:

"In some programs property values may decrease because of preliminary actions by public officials, or the announcement of a proposed project and the prospect that the property probably will be taken for the project. Where this occurs several years before the actual taking, especially in urban areas, tenants move out or fail to renew their leases and new tenants cannot be obtained, buildings are abandoned, the neighborhood deteriorates or is deserted, and vandalism sets in. By the time the property is taken, values frequently have decreased sharply." *In re 572 Warren Street* (1969), 298 N. Y. S. 2d 429.

"When an owner becomes aware that his property may be condemned by a public agency, he is naturally hesitant to develop it to any great extent. He also may experience difficulty in selling the property, since prospective purchasers have become aware of possible condemnation. As a practical matter, this situation arises more frequently with proposed routes for public highways than in other public uses. Generally condemnation for public uses involving buildings for City, County or State governments or school districts and the like, is not open to public knowledge a great deal in advance of the actual acquisition of the property. However, routes for highways are often adopted many years prior to the actual acquisition and construction and this poses a practical problem for the owner." *"Impending Condemnation and Justification of Use,"* Real Property, Probate and Trust Journal, Spring, 1968.

The recent cases have recognized that public knowledge of the proposed condemnation will itself affect the value of the property. Initial "active steps" merely amplify the effect. The courts have held that an owner is entitled to compensation equal to the value of the property "* * * unaffected by any knowledge of an impending taking." *Lipinski* v. *Lynn Redevelopment Authority* (Mass. 1969), 246 N. E. 2d 429.

In *Urban Renewal* v. *Monsky* (1968), 426 S. W. 2d, the court held:

"The court is committed to the rule that the value of property taken by condemnation proceedings is to be measured by the fair market value just before it was gen-

erally known that the public project would be performed.''

See also *Tharp* v. *Urban Renewal, supra*; *Commonwealth of Kentucky* v. *Elkin, supra*.

The court finds on the basis of the evidence and exhibits that the value of the Bunner property was affected as early as July and August, 1965, at which time the property was unsalable. Later the tenants deserted the property, due to the imminence of the appropriation, and the property was unrentable. The court finds that the decline in value of the Bunner property which began as early as July 1965, was due to the activities of the State Highway Department in the area and to the general knowledge that an appropriation of the Bunner property and the other properties on Wade Avenue was imminent.

The state has suggested that any depreciation in the Bunner property resulted from natural decline of the neighborhood or from the failure of the Bunners to maintain the property. The state claims that the decline in the value of this property was produced by ''natural causes'' rather than by the effects of the proposed project.

It is not necessary for the property owner, in establishing his right to an early valuation, to demonstrate that the actions of the state were the *sole* cause of the decline in value of his property. The test has *never* been stated in those terms. Rather, the test is as follows:

''An abuse of the exercise of the power of eminent domain would constitute the taking of private property without just compensation, if that abuse directly and proximately *contributes to, hastens, and aggravates, acting alone or in combination with other causes, the deterioration and decline in value of the area and the subject property.*'' *Sayre* v. *U. S.*

See also *City of Cleveland* v. *Hurwitz, supra*, where a claim similar to the state's was made.

The test has been similarly stated in *Foster* v. *Herley* (E. D. Mich. 1966), 254 F. Supp. 655, *aff'd*  F. 2d (1968). There the court stated:

''* * * This court finds, as a matter of fact, that the protracted delay and the actions of the defendant, if they were not the only causes, substantially contributed to,

hastened, and aggravated the deterioration and decline in value of the area in general in this plaintiff's property in particular.''

And further:

''This court now holds that the actions to the defendant which substantially contributed to and accelerated the decline in value of the plaintiff's property constituted a 'taking' of plaintiff's property within the meaning of the 5th Amendment for which just compensation must be paid.'' *Foster* v. *Herley, supra.*

The property owner does not have to establish that the proposed project was the *sole* cause of the decline in value of this property. Rather, he must establish that it was *a* cause or a *contributing* cause or *one of a number* of causes. The property must be valued at a date prior to the depreciation attributable to the project.

This question, however, is academic. The court has found no persuasive evidence in the record which would explain the decline in value of the Bunner property which began as early as July, 1965. There is no persuasive evidence in the record which could explain why the property could not be sold, other than the imminence of appropriation. Neither is there any persuasive evidence in the record which would explain the sudden desertion of the property in November 1965, other than the general knowledge that an appropriation was imminent and the recent visit of State Highway officials advising people of this fact.

The present case is strikingly similar, in its timing of events, to *Becos* v. *Masheter, supra.* The Supreme Court of Ohio, in its opinion in that case, described the sequence of events leading to the destruction of the owner's property:

''The first neighborhood acquisition under the program in this case was in May, 1961. The first demolition was in January 1962. * * * The neighborhood began to deteriorate. Following the movement of residents, vandalism, rodent damage, and fires depreciated properties in the vicinity of and including appellees' property. One of the landowners testified that the appellees' duplex was a rental property and that the last tenants left in July or August

1962. * * * When the last tenant left, appellees had the duplex boarded up, but it was almost immediately vandalized and the interior badly damaged.''

The time interval in this case and the *Becos* case are strikingly similar. Both properties were rental properties. The tenants moved out within a year after the first purchase by the state in the immediate area and within half a year of the first demolition.

As many courts have observed, the first effect of state activities in the area and of public knowledge of the imminent appropriation is felt in tenant-occupied buildings. The tenants are not tied to the property; they have no investment in it; they are free to leave; and when they know that they soon will have to leave, they normally move out on their own, when it is convenient to them. In urban areas, particularly along a freeway route, buildings which are vacated will often be vandalized. The evidence indicated that that occurred repeatedly along the route of Interstate 90.

Another court has described the process that occurs when tenants learn that the property in which they live is about to be appropriated. *In re 572 Warren Street* (1968), 298 N. Y. S. 429, involved the purchase of a building in connection with a housing project. The Housing Relocation Agency, upon learning that the project would include the subject property, sent a booklet around to each of the tenants advising them of the project and telling them that they would be given help in moving. The booklet emphasized, however, that the tenants did not have to move now:

''* * * immediately after these letters and pamphlets were distributed throughout the house the tenants began to move, and vacated apartments were promptly vandalized with thefts of the refrigerators, stoves, kitchen tubs, etc. By October 1, 1967 (two months later) the owner testified, and he was not contradicted, that half of the tenants had moved and most of the others had refused to pay rent. * * *

''By the time the 1967 cooler weather came in, the landlord was getting practically no income whatsoever. None of the vacated apartments could be rented because of the vandalism and also because the impending condemnation had been noised throughout the area by the City Housing

employees. As a result the landlord could not raise enough necessary funds for repairs or fuel and by November, 75% of the tenants had vacated.''

The above is a case in which the property was vacated and vandalized in a period of only three to four months from the date the tenants first learned the property would be appropriated.

The expectation that the property will be appropriated affects the behavior not only of the owner, but of the tenants, other persons in the neighborhood, potential tenants, purchasers, and in fact anyone who is in any way connected with the property.

''As a rule, when an announcement is made that a condemnation is contemplated, the property which is designated for taking can be severely damaged in terms of its usefulness or value for ordinary real estate purposes. Such property is not generally suitable for sale or long-term leasing since the threat of condemnation would make unavailable the use to which the property might otherwise effectively be put.

''If property is taken promptly after the announcement the loss of value between that time and the actual date of taking (as of which date the fair compensation for the property is fixed) is usually *de minimus* and consequently is either disregarded in fixing the value of the property or is given consideration in the amount of the award eventually fixed in the condemnation proceeding. Where, however, a long period of time elapses before the actual legal taking in condemnation, serious damage can be suffered by the owner which would not be adequately compensated in the award finally made in the condemnation proceedings.'' Real Property, Probate and Trust Journal 1968, Page 174.

The damage which is inflicted upon property subject to condemnation for a long period of time is not necessarily the *fault* of anyone. Damage to property which is the subject of condemnation for a long period of time is often inevitable. It may be the fault of no one. Nevertheless, it occurs. And when it does occur, the owner is not made to suffer that damage.

In the present case, the state will not have to pay any

more for this property than it could reasonably have expected to pay. Certainly, the state anticipated purchasing each of the properties on Wade Avenue in the condition these properties had been in for a number of years. To allow the state to purchase the Bunner property for one dollar (plus the cost of the land) would result in an unexpected and unjustified windfall of the state of Ohio. And it would result in an unjustifiable loss to the owner. The owner could never claim damages for the *increased* value of the property due to the freeway. Neither should he be required to suffer the *decreased* value which the freeway occasioned.

The general rule of law, which is also the rule of Ohio is as follows:

"Any change in the fair market value (of property) prior to the date of condemnation which the condemnor or condemnee establishes was substantially due to the general knowledge of the imminence of condemnation, other than that due to the physical deterioration of the property within the reasonable control of the condemnee, shall be disregarded in determining fair market value."

Undoubtedly, such a change in value occurred here. Undoubtedly, that change was due to the general knowledge of the imminence of condemnation in the area of the Bunner property. Everyone knew the highway was coming through. Everyone expected it momentarily. Indeed, when people inquired of the state as to when their properties would be taken, they were told that appropriation would begin in the latter part of 1965 or the early part of 1966. The state even opened a relocation agency in the neighborhood to assist people who were moving out of the way of the freeway. And Mr. Braman, in October and November, 1965, was going into properties right behind the Bunner property to appraise them for appropriation. The Dulack property two doors away had been purchased and demolished months before. Everyone knew the freeway was coming through, and everyone expected it momentarily.

Doctor Bunner's tenants wisely chose to get out of the way of the freeway before the freeway pushed them out. Obviously, they did not want to remain in an area where

vandalism, looting, and arson were occurring. This was the situation in other portions of I-90 right-of-way.

The Bunner tenants chose to leave. The Bunner property was immediately vandalized. What happened to the Bunner property happened to other properties in the area a few months later, when their owners and the owners' families were able to move. All these activities were the result of the highway and the expectation by everyone that the highway was about to come through. In point of fact, this expectation was accurate. The Bunner tenants *did* get out just in time. And the Bunner property was vandalized only four months before the state's appraiser, who was busy on the street behind the Bunner property, got around to appraising it.

The abandonment and vandalization of the Bunner property is completely unexplainable except by reference to general knowledge of the imminence of the I-90 Northwest Freeway. Everything that occurred on the Bunner property resulted from public knowledge that the property was about to be appropriated. Therefore, the Bunner property should be valued at a date prior to the time its value began to decline as a result of public knowledge of the freeway.

As the court has stated, the evidence established conclusively that the Bunner property began to decline in value in July and August, 1955. This decline was due to the activities of the State Highway Department in the immediate area and to general knowledge of the imminence of condemnation. Therefore, on the basis of the applicable rules of law noted above, the court finds and determines that the proper date for valuing the Bunner property for all purposes connected with this litigation is July 1, 1965.