WASHINGTON MARKET ENTERPRISES, INC., A NEW JERSEY CORPORATION, APPELLANT, v. THE CITY OF TRENTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT.

Argued January 7, 1975—Decided July 28, 1975.

*Mr. Frederick J. Schragger* argued the cause for appellant (*Messrs. Schragger, Schragger and Lavine,* attorneys; *Mr. Raymond L. Nagy,* on the brief).

Mr. *Ronald Berman* argued the cause for respondent (*Messrs. Warren, Goldberg and Berman,* attorneys).

Mr. *Richard L. Rudin,* Deputy Attorney General, argued the cause as *amicus curiae* (Mr. *William F. Hyland,* Attorney General of New Jersey, attorney; Mr. *Stephen Skillman,* Assistant Attorney General, of counsel; Mr. *Rudin,* on the brief).

The opinion of the Court was delivered by

MOUNTAIN, J. This case presents the question of whether there can be a taking of property for which the Constitution demands just compensation, absent a physical invasion of the property or a direct legal restraint on its use. The suit arises out of the activities of the City of Trenton in first undertaking and then abandoning an urban redevelopment project for the business district of central Trenton. Plaintiff alleges that these activities resulted in the substantial destruction of the value of its property. It seeks to compel condemnation, or in the alternative, to be recompensed by way of damages for loss of value. At the trial level, defendant's motion for summary judgment was successful. We granted direct certification of plaintiff's appeal, *R.* 2:12–2, because of the importance of the issue presented.

The premises in question consist of a parcel of land upon which has been erected a large building designed for commercial use. Allegedly, what had been tenantable office and retail space is now largely vacant. It is contended that this is attributable, wholly or in large part, to the action taken by the City.

For reasons hereinafter set forth, we hold that where planning for urban redevelopment is clearly shown to have had such a severe impact as substantially to destroy the beneficial use which a landowner has made of his property, then there has been a "taking of property" within the meaning of that constitutional phrase.

I

█ As the matter is before us on appeal from a grant of summary judgment awarded the defendant, we must accept as true all record facts and reasonable inferences therefrom in the light most favorable to the plaintiff. *Judson v. Peoples Bank and Trust Co. of Westfield,* 17 *N. J.* 67 (1954).

In 1958 Trenton undertook a feasibility study for the redevelopment of a considerable part of the downtown area of the municipality. From the very beginning a large shopping mall was planned which would require, were the project to come to fruition, the condemnation of plaintiff's property. After considerable study the city decided to proceed first with a smaller undertaking (the Fitch Way Project) immediately to the south of the planned mall area. The land for the Fitch Way Project was acquired and buildings thereon razed in 1963. In 1964 a public hearing was held on the question of whether the proposed mall area (now designated as the Center City South Project) should be declared "blighted," this being the first formal step looking to ultimate acquisition. For reasons not of record no declaration of blight was forthcoming at that time (apparently the City was experiencing difficulties in developing the Fitch Way Project). During this period and the ensuing years there were repeated newspaper accounts of the progress being made toward the creation of the proposed mall and officials of the City were making public statements describing the plans which had been made with respect thereto.

In 1967 another public hearing was held, and in September of that year the land encompassing the Center City South Project (including plaintiff's property) was declared a blighted area. Before the City moved to acquire the land, the Department of Housing and Urban Development of the federal government altered the designation of the project from a conventional Urban Renewal Program to a Neighborhood Redevelopment Program. The change meant that in-

stead of receiving a block grant to acquire all of the properties at one time, the City would receive smaller grants in each of several successive years and only gradually come to acquire the entire tract. In the ordinary course plaintiff's property would have been one of the last taken, as it was large and in relatively good condition. The program continued for three years after the change mentioned above. During this time half of the properties in the project area were acquired by the City. In May of 1973 Trenton finally concluded that its redevelopment priorities lay elsewhere and notified the remaining property owners (including plaintiff) that the project was to be abandoned and that their lands would not be taken.

Plaintiff alleges that beginning in 1963 tenants began moving out in direct response to the threatened condemnation.[1] After 1963 it was impossible to find a long-term tenant interested in the building. The space was finally rented to two temporary tenants whose rent barely met the expense of upkeep. After the declaration of blight in 1967 the area surrounding plaintiff's property markedly deteriorated and several buildings in the area were boarded up. Many neighboring properties were purchased or condemned. In 1972 the temporary tenants vacated and thereafter the building was for the most part vacant.[2] Premises which had been generating $160,000 annually in 1963, were yielding $6,300 in rent in 1973.[3]

---

[1]Actually plaintiff concedes, as it must, that its principal tenant, the Department of Labor and Industry of the State of New Jersey, moved out because its new building had been completed. However, plaintiff also alleges that other New Jersey agencies, including the Department of State, were very interested in space until learning that the property was scheduled for redevelopment acquisition.

[2]A small branch bank remains. Part of the building has been rented for warehouse space.

[3]The annual insurance charge against the building was $9,500 and the property taxes annually amounted to $30,000. The premises have been sold for taxes.

## II

The trial court, in deciding the motion for summary judgment, relied upon a section of the Blighted Area Act, *N. J. S. A.* 40:55–21.10, and upon our decisions in *Wilson v. City of Long Branch,* 27 *N. J.* 360, *cert. denied.* 358 *U. S.* 873, 79 S. Ct. 113, 3 *L. Ed.* 2d 104 (1958); *Lyons v. City of Camden,* 52 *N. J.* 89 (1968); and *Jersey City Redevelopment Agency v. Kugler,* 58 *N. J.* 374 (1971). The trial judge concluded that under New Jersey law there can be no taking absent a physical invasion or a direct legal restraint on use. He felt that this was a "harsh" rule and was "completely unfair"; nevertheless, he felt bound by these precedents and entered judgment for the defendant.

In *Wilson* the validity of the Blighted Area Act, *N. J. S. A.* 40:55–21.1 *et seq.* was challenged, largely on constitutional grounds. One of the arguments advanced was that the very act of filing a declaration of blight was a "taking of property" because it seriously impaired land values. We held that this was not a taking, saying:

> It is akin to the result which flows from municipal zoning. If some diminution in market value can be said to follow from a finding of blight inspired by the valid exercise of police power, it is *damnum absque injuria.* [*Id.,* 27 *N. J.* at 374]

We sustained the constitutionality of the statute.

In *Lyons,* homeowners challenged the propriety of including their properties within an area declared to be blighted. The thrust of their claims was that while most of the land covered by the declaration was doubtless blighted, the area where their properties were located was not. While upholding the action of the condemning agency, we expressed our sympathetic recognition of the plight of the landowner in these terms:

> There can be no doubt that a declaration of blight ordinarily adversely affects the market value of property involved. This is unfortunate because in so many instances the physical taking of the prop-

erty does not occur for a number of years. In the meantime the owner can only wait for that ultimate taking; there is usually no reasonable market otherwise open to him for sale of the property. Moreover, in the interim his good housekeeping incentive generally recedes and deterioration of the building sets in. The Legislature has recognized the difficulty and has partially rectified it by providing that when property previously declared blighted is condemned the value "shall be fixed and determined to be no less than the value as of the date of the declaration of blight * * *." *L.* 1967, *c.* 217, § 1; *N. J. S. A.* 40:55-21.10.

In fairness, it is not enough to assure the property owner that at some time, perhaps years hence, he will receive the market value of his property as of the date of the declaration of blight. Meanwhile, he and his family may well be imprisoned economically in the blighted area because he needs the capital invested in the blighted-area dwelling in order to purchase a new home elsewhere. Consequently, he must endure the deterioration that afflicts a neighborhood at an accelerated pace following a declaration of blight. In this contest, equitable considerations call for action by the public authority to effectuate the redevelopment plan with reasonable dispatch, at least to the extent of the financing necessary to acquire the land to be redeveloped. [*Id.*, 52 *N. J.* at 99]

In addition to directing the defendant to proceed expeditiously, we pointed out that if this were not done the plaintiff would be at liberty to apply to the Superior Court for such relief as the demands of justice might require.

In *Jersey City* a redevelopment authority attacked the constitutionality of the 1967 amendment to the Blighted Area Act.[4] The authority argued that the enactment was an unconstitutional invasion by the legislature of the judicial prerogative of establishing rules of just compensation. We held that the legislature was clearly empowered to establish rules of compensation and that these might exceed the constitutional minimum. Speaking of our earlier decision in *Wilson,* we said:

---

[4]*L.* 1967, *c.* 217 amended the Blighted Area Act to provide that upon condemnation a property owner would receive by way of compensation for the taking, an amount not less than the value of the property on the date of the declaration of blight. The amendment is now found in *N. J. S. A.* 40:55-21.10.

We recognized as a practical matter that a declaration of blight caused a depreciation of the property involved, but we held that such diminution in value was not a taking in the constitutional sense. Since the redevelopment project might be abandoned by the municipality, it followed that no legally cognizable damage existed, at least until an *actual* taking occurred through exercise of the power of eminent domain. [*Id.*, 58 *N. J.* at 380-81; emphasis in the original]

While there is nothing in our opinion today inconsistent with the holding in *Jersey City,* we recognize that some of the foregoing language may seem not to accord with certain statements made below. To that extent what we say here should be deemed controlling. Actually, however, the above excerpt from our earlier opinion goes little further than to say that a declaration of blight, in and of itself, will not constitute a taking. It does not address itself to the situation here presented, where, in addition to the declaration of blight, other related activities together with the passage of time are said to have shorn property of literally all or most of its value. Nor should the quoted passage be read as saying that a taking requiring the payment of compensation can occur *only* as the result of an exercise of the power of eminent domain.

The language of the Blighted Area Act upon which the trial court placed reliance, reads as follows:

If the determination is that an area is a blighted area, the governing body of the municipality may, but shall not be required to, acquire the real property . . . [*N. J. S. A.* 40:55-21.10]

Were this a legislative attempt to fix or interpret the dimensions of the Just Compensation Clause we would accord the legislative view great weight in forming our own independent judgment. But this statute says no more than that a declaration of blight, in and of itself, does not require a municipality to complete fully all aspects of its proposed plan, including the ultimate acquisition of each piece of property in the blighted area. It may, at some point, decide to abandon the project. That is what has happened here. It does not follow,

however, that abandonment of the project automatically insulates the public body which has had it in charge, from the obligation to make just compensation in those instances where its activities have already practically destroyed the beneficial use of a particular property.

The foregoing cases and this statute, considered singly or together, do not establish the proposition that there can be no *de facto* taking absent a physical invasion or a direct restraint on use. Rather they stand for the principle that not every impairment of value establishes a taking. The question of whether a total or substantial destruction of the beneficial use of property amounts to a taking in the constitutional sense was previously before this Court in *Board of Educ. of Morristown v. Palmer*, 46 *N. J.* 522 (1966), *rev'g as premature*, 88 *N. J. Super.* 378 (App. Div. 1965). There we expressly reserved the issue we decide today.

## III

The general question as to when governmental action amounts to a taking of property has always presented a vexing and thorny problem.[5] If there has been a taking, both Federal and State Constitutions require the payment of compensation: *U. S. Const. amend. V; N. J. Const. art. 1*, ¶ 20. If there has not been a taking, any loss that may have been suffered is *damnum absque injuria;* there has been a noncompensable governmental exercise of the police power.[6]

---

[5]As Justice Holmes said in dissent in *Springer v. Government of the Philippine Islands*, 277 *U. S.* 189, 209–10, 48 S. Ct. 480, 484–85, 72 *L. Ed.* 845, 852 (1928):

The great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other.

[6]Professor Michelman, in "Property, Utility, and Fairness: Comments on the Ethical Foundations of 'Just Compensation' Law," 80 *Harv. L. Rev.* 1165 (1967), has described our role as follows:

In partial taking cases, for instance in the construction of a highway, the landowner is entitled to be paid the value of the land taken, together with the diminution in value of the part that remains (severance value), *Village of Ridgewood v. Sreel Investment Corp.*, 28 *N. J.* 121, 125 (1958); *State v. Interpace Corp.*, 130 *N. J. Super.* 322, 329 (1974). Yet if no part of an adjoining property owner's land is taken, that neighbor will receive no compensation for the loss he may have suffered by virtue of his property now being close to a noisy expressway. *Beseman v. Pennsylvania R. R. Co.*, 50 *N. J. L.* 235 (Sup. Ct. 1888), *aff'd*, 52 *N. J. L.* 221 (E. & A. 1889). While the results of these rules are sometimes harsh and seemingly inconsistent, it must be borne in mind that they represent pragmatic legislative and judicial responses to practical problems rather than being products of refined logic. *See United States v. Reynolds*, 397 *U. S.* 14, 90 S. Ct. 803, 25 *L. Ed.* 2d 12 (1970).

It was early held that actual appropriation or invasion might be deemed a compensable taking, although unrelated to any condemnation proceeding, *Pumpelly v. Green Bay and Mississippi Canal Co.*, 13 Wall. 166, 80 *U. S.* 166, 20 *L. Ed.* 557 (1872); *Glover v. Powell*, 10 *N. J. Eq.* 211 (Ch. 1854); *Sinnickson v. Johnson*, 17 *N. J. L.* 129 (Sup. Ct. 1839). From such cases there developed the idea of physical invasion or appropriation as the chief criterion for determining whether a "taking" had occurred. While the physical invasion standard has proven useful in singling out those occasions where compensation should clearly be forthcoming, it is obviously too narrow a standard to identify all instances of compensable taking. Such instances have been found where there had been no physical invasion, and

---

[A] court assigned to differentiate among impacts which are and are not "takings" is essentially engaged in deciding when government may execute public programs while leaving associated costs disproportionately concentrated upon one or a few persons. [Id. at 1165]

indeed there have been rare occasions where despite physical invasion, no taking was found to have occurred, *National Bd. of YMCA v. United States,* 395 *U. S.* 85, 89 S. Ct. 1511, 23 *L. Ed.* 2d 117 (1969).

The major departure from the physical invasion test is to be found in the cases dealing with direct restraints on the use of property. While the ultimate criterion for determining whether a taking has occurred in this context is still a subject of dispute, *e. g.,* Sax, "Takings, Private Property and Public Rights," 81 *Yale L. J.* 149 (1971), there is no doubt that land use restraints can amount to a taking of property, *Pennsylvania Coal Co. v. Mahon,* 260 *U. S.* 393, 43 S. Ct. 158, 67 *L. Ed.* 322 (1922) (Holmes, J.). We have held upon several occasions that depriving an owner of undeveloped land of all beneficial use of that land for a significant period of time was a "taking." *Lomarch Corp. v. Mayor of Englewood,* 51 *N. J.* 108 (1968); *Morris County Land Improvement Co. v. Township of Parsippany-Troy Hills,* 40 *N. J.* 539 (1963) (*but see AMG Associates v. Township of Springfield,* 65 *N. J.* 101, 112 (1974)); *Grosso v. Board of Adjustment of Millburn Tp.,* 137 *N. J. L.* 630 (Sup. Ct. 1948).

There is another context that has presented the issue anew as to whether there may be a taking without physical appropriation. The United States Supreme Court has held that low overflights of aircraft which make impossible the continuance of a business on premises adjoining an airport, *United States v. Causby,* 328 *U. S.* 256, 66 S. Ct. 1062, 90 *L. Ed.* 1206 (1946), or render living conditions intolerable in a home so located, *Griggs v. Allegheny County,* 369 *U. S.* 84, 82 S. Ct. 531, 7 L. Ed. 2d 585 (1962) constitute compensable takings. Lower Federal courts have tended to limit these holdings to permit recovery only by property owners located directly below the flight path. *Batten v. United States,* 306 *F.* 2d 580, 583 (10th Cir. 1962), *cert. denied,* 371 *U. S.* 955, 83 S. Ct. 506, 9 *L. Ed.* 2d 502 (1963);

*Avery v. United States,* 330 *F.* 2d 640, 645, 165 Ct. Cl. 357 (1964); *Bellamy v. United States,* 235 *F. Supp.* 139, 140 (E. D. S. C. 1964); *Leavell v. United States,* 234 *F. Supp.* 734, 739 (E. D. S. C. 1964); *Neher v. United States,* 265 *F. Supp.* 210, 216 (D. Minn. 1967).[7] But several state courts have rejected this narrow view and have allowed recovery upon the ground that there has been a taking, although the affected premises were close to, but not directly beneath, the flightpath. *Alevizos v. Metropolitan Airports Comm'n. of Minneapolis & St. Paul,* 298 *Minn.* 471, 216 *N. W.* 2d 651 (1974); *Martin v. Port of Seattle,* 64 *Wash.* 2d 309, 391 *P.* 2d 540 (Sup. Ct. 1964), *cert. denied,* 379 *U. S.* 989, 85 S. Ct. 701, 13 *L. Ed.* 2d 610 (1965); *Thornburg v. Port of Portland,* 233 *Or.* 178, 376 *P.* 2d 100 (Sup. Ct. 1962). As the court said in *Martin,*

We are unable to accept the premise that recovery for interference with the use of land should depend upon anything as irrelevant as whether the wing tip of the aircraft passes through some fraction of an inch of the airspace directly above the plaintiff's land. [391 *P.* 2d at 545]

The case before us is yet another instance of a claim to compensation resting upon an alleged taking, where there is not, and will not be, any physical invasion of the plaintiff's land. It is asserted that the extensive loss of value which has been suffered is in large part attributable to the declaration of blight and to the related activities of the City of Trenton in and around the immediate vicinity of the property. This has had the effect, plaintiff argues, of substantially destroying the value of the property for the use to which it was adapted and to which it was being put.

A declaration of blight is one of the early steps in an urban renewal project. Experience had shown that there is

[7] However, even in *Batten* the majority pointed out that the facts before the court did not disclose a destruction of use (at 585). *See also, Bellamy, supra,* at 140 and *Leavell, supra,* at 738.

generally a considerable interval of time between such an announcement and the eventual acquisition — whether by purchase or condemnation — of property located in the blighted area. Occasionally, as was the case here, the project will be entirely abandoned before completion. From the time it becomes generally known that an area has been selected as the site of an urban renewal project, as we have pointed out in earlier cases cited above, there ceases to be a ready market for premises within the area. It becomes difficult to find tenants and impossible to enter into long-term leases. Upkeep, maintenance and renovation cease; the value of the property tends constantly to diminish.[8]

The statute adopted by our Legislature in 1967, to which reference is made above, decreed that a property owner would receive an award in condemnation no less than the value of his property on the date of the declaration of blight. This was an important legislative response to the problem, which had been identified and discussed in *Report of the Eminent Domain Revision Commission of New Jersey* 24–28 (1965). Where there eventually is a condemnation action resulting in an award to the landowner, the statute should go far to right what might otherwise be grave injustice. Here, however, there has been no condemnation action instituted by defendant. Hence the statute cannot help this plaintiff, or other property owners who may be similarly situated. This contrast between the unfortunate plight of the owner whose property has suffered the consequences of a declaration of blight, but has not been condemned, and the relatively fair treatment accorded a neighboring owner whose property has in fact been taken, strongly

---

[8]The problem has been noticed and discussed. *E. g.*, Adams, "Eminent Domain, Police Power and Urban Renewal: Compensation for Interim Depreciation in Land Values," 7 *Ga. L. Rev.* 226 (1973) ; Comment, "Delay, Abandonment of Condemnation, and Just Compensation," 41 *So. Cal. L. Rev.* 862 (1968).

suggests that the treatment of the former has been arbitrary and unfair.

Courts have sought to meet the problem of condemnation blight in various ways. Many cases, while not finding any taking prior to a condemnation award or some form of physical appropriation, have nonetheless allowed the property owner to include the loss he has suffered in the determination of the damages to which he becomes ultimately entitled in eminent domain proceedings. *City of Buffalo v. J. W. Clement Co., Inc.,* 28 *N. Y.* 2d 241, 321 *N. Y. S.* 2d 345, 269 *N. E.* 2d 895 (Ct. App. 1971), *noted in* 72 *Colum. L. Rev.* 772 (1972); *In re Elmwood Park Project Sect. 1, Group B,* 376 *Mich.* 311, 136 *N. W.* 2d 896 (Sup. Ct. 1965); *City of Cleveland v. Carcione,* 118 *Ohio App.* 525, 190 *N. E.* 2d 52 (Ct. App. 1963); *Cleveland v. Hurwitz,* 19 *Ohio Misc.* 184, 249 *N. E.* 2d 562 (Ohio Probate 1969). But some courts have found, or have indicated a willingness to find, a compensable taking in this type of case, even though there has been no physical invasion nor any condemnation award. In *Foster v. City of Detroit,* 254 *F. Supp.* 655 (E. D. Mich. 1966), *aff'd,* 405 *F.* 2d 138 (6th Cir. 1968), condemnation proceedings were commenced in 1950 only to be abandoned in 1960. A second proceeding, commenced a few years later, fixed the value of plaintiff's property as of the initiation of the second action. The court concluded that this did not constitute fair compensation. It said,

[T]his court now holds that the actions of the defendant which substantially contributed to and accelerated the decline in value of plaintiffs' property constituted a "taking" of plaintiffs' property within the meaning of the Fifth Amendment, for which just compensation must be paid. [254 *F. Supp.* at 665–66]

The court further determined that the taking actually took place in December, 1954, by which time the activities of the public agency had substantially destroyed the value of the property.

■ In *Howell Plaza, Inc. v. State Highway Comm'n.* 66 *Wis.* 2d 720, 226 *N. W.* 2d 185 (Sup. Ct. 1975), although refusing to order inverse condemnation on the facts before it, the court nonetheless said:

> We have no doubt that there can be a cause of action for inverse condemnation if the facts alleged are sufficient to show that property owners so situated [in the path of a proposed freeway] have been deprived of all, or substantially all, of the beneficial use of their property. [226 *N. W.* 2d at 189]

*See also, Madison Realty Co. v. City of Detroit,* 315 *F. Supp.* 367 (E. D. Mich. 1970). We hold that where the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of his property, then there has been a taking of property within the meaning of the Constitution.[9]

Our own courts have forecast the rule we announce today. Judge (now Justice) Pashman's opinion in *East Rutherford Indus. Park, Inc. v. State,* 119 *N. J. Super.* 352, 371 (Law Div. 1972), and Judge Doan's opinion in *Freeman v. Paterson Redevelopment Agency,* 128 *N. J. Super.* 448, 456–57 (Law Div. 1974), although concluding that no relief was available on the particular facts presented, took pains to point out that in those cases there had been no substantial destruction of beneficial use. In *Board of Educ. of Morristown v. Palmer,* 88 *N. J. Super.* 378 (App. Div. 1965), *rev'd as premature,* 46 *N. J.* 522 (1966), *noted in* 20 *Rutgers L.*

---

[9]Our holding appears narrow if compared with the California Supreme Court decision in *Klopping v. City of Whittier,* 8 *Cal.* 3d 39, 104 Cal. Rptr. 1, 500 *P.* 2d 1345 (1972). That case held that a measurable decrease in market value due to an unreasonable delay on the part of the condemning authority is compensable. While not mentioned in *Klopping,* California's constitution provides that property shall not be "taken or damaged" without just compensation, *Cal. Const.,* art. I, § 14. More than twenty state constitutions contain this "damaging" provision, Note, 26 *Stan. L. Rev.* 1439, 1439–40, (1974). *See generally* 3 *Nichols, Eminent Domain* § 6.44, *et seq.* (3 ed. Sackman 1974).

*Rev.* 378 (1966), Judge Goldmann, speaking for the Appellate Division, reached a decision and laid down a doctrinal basis for its support, which are indistinguishable from what we do today.[10]

IV

As mentioned above, the plaintiff requests relief by way of an order directing the defendant to condemn its property, or in the alternative that it be awarded damages for its loss in value. Generally speaking, condemnation should be ordered only where eventual acquisition appears inevitable, *Conroy-Prugh Glass Co. v. Commonwealth,* 456 *Pa.* 384, 321 *A.* 2d 598 (Sup. Ct. 1974), or where equitable considerations mandate that remedy. A private person is generally better able to develop and exploit a piece of real estate than is a municipality and as a matter of policy it is undesirable to remove ratables from the tax rolls. We think it inappropriate to grant this form of relief here.

If, however, the plaintiff is successful in its proofs, it should be entitled to damages. Upon remand the plaintiff will be required to show that there has been substantial destruction of the value of its property and that defendant's activities have been a substantial factor in bringing this about. It will be part of its burden of proof to identify the approximate time that this occurred; this will become the date of taking. Plaintiff will then be called upon to estab-

---

[10]In that case the proposed construction of a state highway threatened to render useless for school purposes a tract of land in Morristown that was then devoted to school use. The opinion of the court said,

If the beneficial use has indeed been destroyed, there will be no other choice but to move, at an alleged cost of some 2–2½ million dollars. In such a case justice demands that the right to compensation as well as the amount thereof be determined by the effect of the proposed highway construction upon the school faciilties, without regard to whether such construction involves a physical invasion of the property. [88 *N. J. Super.* at 390–91]

lish what the property would have been then worth had there been no declaration of blight and had the ensuing and related activities of the defendant not occurred.[11] Finally, the value of the property as of the date the project was abandoned must be ascertained. This value should actually be determined as of a date somewhat subsequent to the date abandonment was announced so that the market's response to the lifting of the threat of condemnation can be better evaluated. Plaintiff will be entitled to the difference between these sums, with interest from the date of abandonment. It will also be entitled to interest on the value of its property determined as aforesaid as of the date of the hypothesized taking, calculated from that date to the date of the abandonment of the project, less the excess, if any, of rental receipts over actual disbursements made in maintaining the property for this period.

The judgment of the trial court is reversed and the cause remanded to that court for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—6.

*For affirmance*—None.

---

[11]Despite the hypothetical nature of this proof we feel that this approach leads to a more just result than to select a valuation date prior to the time when the City's activities began having an injurious impact. In a blighted area, property values can be expected to be declining, apart from the effect of the declaration of blight, and the city is not responsible for these losses.