HUNTINGTON URBAN RENEWAL AUTHORITY

*v.*

COMMERCIAL ADJUNCT CO., *a corp.*

(No. 13793)

Decided March 28, 1978.

*Greene, Ketchum & Mills, Menis E. Ketchum* for plaintiff.

*Jenkins & Fenstermaker, Norman K. Fenstermaker* for defendant.

NEELY, JUSTICE:

The Huntington Urban Renewal Authority brought this action in the Circuit Court of Cabell County to condemn certain of Commercial Adjunct Co.'s property located in Huntington. Commercial Adjunct contends in this appeal that the jury hearing the case did not award just compensation for the land condemned; no other aspect of the condemnation proceeding is challenged. We agree that the property owner was not justly compensated and reverse the judgment of the circuit court entered upon the jury's verdict.

The record shows that on March 19, 1969, the Huntington City Council approved an urban renewal plan for

an area in Huntington designated as Downtown Project Area No. 1. Following the city council action, the Urban Renewal Authority determined on September 11, 1970 that it was necessary to acquire Commercial Adjunct's property located in the Downtown Project Area. This property had been developed as a parking lot in 1963 and continued to be used for parking during the entire time the Urban Renewal Authority was working on the downtown project.

While its plans to acquire Commercial Adjunct's parking lot were pending, the Urban Renewal Authority proceeded to acquire large tracts of land throughout the project area. Commercial buildings stood on some of this land, and many were either demolished or allowed to stand vacant until they could be converted to a different use. This displacement of businesses from the project area reduced parking demand and caused parking lot revenues to decline, according to the testimony of Commercial Adjunct's expert witnesses. Also, some of the land acquired by the Urban Renewal Authority was developed into parking lots or parking garages which competed with Commercial Adjunct's lot. The adverse effect of this competition on Commercial Adjunct's parking lot revenues was particularly pronounced because of the reduced demand for parking in the project area. Commercial Adjunct was effectively squeezed on two sides by the Urban Renewal Authority, which first reduced the parking demand and then entered into competition for the few remaining parking customers. It is clear that the Urban Renewal Authority's actions were especially detrimental to Commercial Adjunct in this instance and went far beyond the ordinary disruptions that businesses and citizens have come to accept from public works improvement projects.

The parking lot revenues became a crucial issue in this case because of their close link with fair market value calculations. Appraisers for both parties testified at trial that the revenue which a piece of property generates directly affects its fair market value under the "income approach" to property appraisal. Also, common

sense and logic suggest that a property's revenue-generating capacity indirectly affects fair market value calculations under the "market data approach" or "cost approach." It appears, therefore, that regardless of the method of appraisal employed, a commercial property's fair market value will decline in proportion to any decline in the property's revenue-generating capacity, assuming, as we may on the basis of the record before us, that there are no other significant factors affecting the property's value. The question is thus presented in this case whether the trial court should have instructed the jury to disregard any decline in the value of Commercial Adjunct's parking lot for which the jury could hold the Urban Renewal Authority solely and directly responsible.

I

The trial court ruled that the date of taking for purposes of valuing the condemned property was July 14 and 15, 1975, the date of the trial. This was essentially a correct ruling according to the law of West Virginia. *State Road Comm v. Ferguson*, 148 W.Va. 742, 137 S.E.2d 206 (1964); *Buckhannon R. Co. v. Great Scott Coal*, 75 W. Va. 423, 83 S.E. 1031 (1914).[1]

Commercial Adjunct contends that in a complex case like this one, using the date of the taking as the sole reference point for establishing the condemned property's value may lead to an unjust result. In view of the especially detrimental impact the Urban Renewal Authority's actions had on the value of its parking lot,

---

[1] More precisely, the time of the taking is the "date when compensation is paid or secured to be paid, and that can only be either on the report of the commissioners, or after the verdict of the jury has been rendered." *Buckhannon R. Co. v. Great Scott Coal*, 75 W. Va. 423 at 431, 83 S.E. 1031 at 1034 (1914). In the case at bar the order of the circuit court reflects that the full amount of the jury's verdict was deposited with the court within 10 days of the verdict, and further, that interest at 8% was paid for the period between the jury's verdict and the date of the deposit. It may fairly be said, then, that the compensation was secured to be paid as of the date of the jury's verdict, July 15, 1975.

Commercial Adjunct argues persuasively that there must be some adjustment either in the valuation process itself or in the date set for valuation. Without such an adjustment, the condemning authority would receive an undeserved windfall and public policy would be poorly served by the establishment of a financial incentive for government to make special efforts to undermine the value of property it intends to condemn.

The question in this case is a novel one for this jurisdiction, but there is law relating to the converse situation, namely, how to account for any increase in property values due to the public improvement for which the property is taken. A classic statement of the law in this regard is found in *Guyandot Valley R'y Co. v. Buskirk*, 57 W.Va. 417 at 425 (1905), which is concerned with the advent of a railroad:

> It must be perfectly manifest that, in every case of a projected railroad, there is an appreciation in values of real estate all along the proposed line before any condemnation proceedings are instituted, and, since the market value at, or near, the date of the institution of such proceeding, is the measure of compensation, the enhancement due to the prospect of the construction of the railroad must have entered into the market value of the land, and the land owner obtains it because he takes the market value at that time, not at a date prior to the announcement of the intent to construct the road.

> It is unnecessary, however, to rely, for this, upon mere argument from a rule of practice as a premise. Direct authority of high character, for the proposition that the land owner is entitled to general benefits arising from the prospective construction of the work for which the land is appropriated, is at hand.

This statement of the law was affirmed in the more recent case of *Strouds Creek & M. R. Co. v. Herold*, 131 W.Va. 45 at 56, 45 S.E.2d 513 at 521 (1947):

> The market value of his [the landowner's] land, that taken and the residue as well, as it was immediately before the taking, is increased by the amount of the general benefits which accrue to it and he receives the increase as an element of its market value which, for the land taken, he must be paid without any deduction for benefits.

It seems clear, then, that a landowner is entitled to some monetary benefit when the prospect of a public improvement increases the value of the land which is taken for the public improvement. The benefit is, however, limited to so much of the increased land value as is conferred by the "general benefits" of the prospective public improvement. *Strouds Creek*, at 59, 45 S.E.2d at 522, provides a good working definition of the term "general benefits":

> Generally it may be said that advantages of a general character which accrue to the landowner in common with other landowners in the same community from the improvement are general benefits. Improvement of a road or a street, improved facilities for travel or transportation of the public, accessibility of telephone line, and availability of water for irrigation purposes are mentioned as examples of general benefits.

Having examined the rules stated above, we are left to determine how they might aid us in deciding the case at hand. We might say that if a landowner is entitled to benefit from the increase in land values caused by a prospective public improvement, then he should not be heard to complain when the prospective improvement causes his property to decline in value. This would be a logical, although not necessarily reasonable, extrapolation from existing rules. Fortunately, we need not go so far to decide this case, and we can defer until another time our consideration of the wisdom of such a rigid, mechanical approach to the law of eminent domain. Only recently has the thought become widespread that a public improvement project can prove detrimental rather than beneficial to property values. After our govern-

ment has acquired more experience in coping with this anomaly, and when the point is specifically addressed by the briefs and argument, we can begin to formulate new rules of general application.

For the case at hand it suffices to say that the decline in the value of Commercial Adjunct's property resulted from actions of the Urban Renewal Authority that were especially detrimental to Commercial Adjunct's interests. Laying waste to large downtown areas and developing competing parking lots do not produce disadvantages of such a general character that the converse of the rule on general benefits may fairly be applied. For the proper rule we look to our own constitutional provision on just compensation and to the leading case of *City of Cleveland v. Carcione*, 118 Ohio App. 525, 190 N.E.2d 52 (1963).

The subject property in *Carcione* was located in an area declared in 1957 to be in need of urban renewal. In 1959 the City of Cleveland, pursuant to its earlier declaration, moved to acquire the property. Some years later, in 1962, the property owner's compensation was set by a jury in a condemnation proceeding. Evidence showed that gross rental income from the property declined progressively from over $8,000.00 in 1957 to $565.00 in 1962, and the Ohio Court of Appeals found that the "decrease in the gross income . . . was directly caused by the activities of the City of Cleveland in furtherance of the Renewal Project." *Id.*, at 527-28, 190 N.E.2d at 54. Indeed, it was noted that the government had acted in an especially aggressive manner toward the property in question, which consisted of two small apartment buildings. The welfare department notified relief clients living in the Carcione property that it would stop their rental payments unless they moved out, which they did. Also, the welfare department case workers actively assisted relief clients throughout the renewal area to secure new living quarters elsewhere.

The Ohio rule ordinarily applicable in these circumstances was that the value of the property taken be

computed by the jury as of the time of trial, and the jury in *Carcione* was so instructed. The Court of Appeals held, however, that:

> [T]he application of that rule of law may result in an award of compensation ... which is unreasonable and unjust under unusual facts and circumstances ... [and] the time as of which the evaluation of property should be made must comport with the peculiar facts and circumstances of the case so as to assure the owner of the property compensation in money which is just as contemplated by the Constitution of Ohio. [*Id.* at 532, 190 N.E.2d at 57.]

The reasoning of *Carcione* is particularly persuasive here because its facts are nearly the same as ours, and we adopt a similar rule. Under W.Va. Const. art. 3, § 9, which provides that "Private property shall not be taken or damaged for public use without just compensation," we hold that in eminent domain proceedings when the condemnor has effected a decrease in values, not of a general character, a property owner is entitled to an evaluation of his property that comports with the peculiar facts and circumstances of the case. This means in the case before us that Commercial Adjunct is entitled to adduce evidence about any decline in its property's value before the date of the taking which resulted from especially detrimental Urban Renewal Authority actions, and, if the evidence warrants, is entitled to an instruction that such decline be disregarded by the jury in making its compensation award. The circuit court refused to recognize this problem or to give an appropriate instruction, and accordingly, we reverse.

It is obvious that the government is always engaged in the construction of public projects, from roads to cultural centers, and that all of them tend in one way or another to enhance or depreciate the value of the surrounding property. As should be evident from our discussion of general benefits, government or public authority activity in general is not within the purview of

our rule; we are concerned only with governmental activity of a nongeneral character which reduces property values. By way of further limitation we point out that depreciation attributable to the condemning authority must be related to the project for which the land is condemned, so that our term "project" implies activity related to a common scheme or plan.

## II

There is an additional, statutory, ground for our decision. 42 *U.S.C.* 4651 [1971], part of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, provides:

> In order to encourage and expedite the acquisition of real property by agreement with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies:
>
> .  .  .  .
>
> "(3) . . . Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property."

State agencies receiving federal financial assistance must give federal authorities satisfactory assurances that in acquiring real property they will be guided, to the greatest extent practicable under State law, by this policy. 42 *U.S.C.* 4655 (1971). To carry out the federal mandate, the Legislature enacted *W.Va. Code,* 54-3-3 [1972] which makes the federal real property acquisition policies applicable to state agencies and gives state agencies "plenary power and authority to adopt rules

and regulations, which shall have the force and effect of law, to implement the provisions of . . . [the] federal act . . ."

The Huntington Urban Renewal Authority comes within the purview of these statutes, and pursuant to *W.Va. Code*, 54-3-3 [1972], it has adopted a regulation which includes the following language:

> Any decrease or increase in the fair market value of the real property prior to the date of valuation caused by the project for which such property is acquired or by the liklihood [*sic*] that the property would be acquired for such project, other than that due to physical deterioration within the reasonable control of the owner, shall be disregarded in the appraisals and in determining the compensation for the property.

While this regulation, which has the force of state law, only sets standards for the Authority's own dealings with property owners, it does express a policy which supports the rule we have adopted for the determination of just compensation for condemned property under W.Va. Const., art 3, § 9.

In conclusion we would note that the law of eminent domain is one of those areas which requires a high regard on the part of courts for stability. West Virginia precedent on the subject provides a body of understandable and generally consistent cases; however, heretofore our law has been concerned primarily with cases involving railroads, highways, and the taking of parcels of land for limited governmental purposes. We have not had extensive experience with urban renewal authorities, whose activities with regard to particular projects may encompass years, and whose systematic destruction and rebuilding may involve numerous city blocks.

In an urban renewal context we are no longer talking about a mere "taking" for public purposes; we are simultaneously talking about other areas of the law such as the extent to which government may compete with private enterprise in the furtherance of public purpose, and

the effects of such competition on private enterprises which are at a sore disadvantage *vis a vis* the government in the private capital market. Consequently, as indicated above, while it is possible to justify the logic of this opinion on the grounds that we are merely reflecting the mirror image of *Guyandott Valley R'y Co. v. Buskirk, supra,* or *Strouds Creek & M. R. Co. v. Herold, supra,* concerning general rather than special benefits, or here, detriments, it should also be recognized that we can characterize anything as a "special" as opposed to a "general" benefit or detriment, and in that way dispose of all cases without ever squarely addressing the underlying economic and social issues. The notion of special as contrasted with general benefits demonstrates that even our prior law has recognized that there are degrees of improvement and damage which can be done by a public authority to land values, some of which may be considered the normal and acceptable vicissitudes of commercial life in a fluid society, and some of which are so extraordinary as to require special rules and treatment.

Nonetheless, the policy expressed in both 42 *U.S.C.* 4651 (1971) and *W.Va. Code,* 54-3-3 [1972] is as rational a precedent as any of our prior cases for guiding us in determining the rules which should evolve in the coming area of condemnations actions involving urban renewal authorities. New problems require new approaches; this case probably heralds our willingness to conceptualize condemnation for urban renewal projects as a distinct and separate area of the otherwise well settled law of eminent domain.

*Reversed.*