695 A.2d 1344

TOWNSHIP OF WEST WINDSOR IN THE COUNTY OF MERCER, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. YVETTE NIERENBERG AND PRINCETON MANOR ASSOCIATES, DEFENDANTS–APPELLANTS.

Argued November 4, 1996—Decided June 30, 1997.

112

*Edward D. McKirdy* argued the cause for appellant Yvette Nierenberg (*McKirdy* and *Riskin,* attorneys).

*Andrew J. Rothman* argued the cause for appellant Princeton Manor Associates (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys).

*Richard L. Rudin* argued the cause for respondent (*Weiner Lesniak,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This case concerns the appropriate date for valuing condemned property pursuant to the Eminent Domain Act of 1971 (*N.J.S.A.*

20:3–1 to –50) (Act). The Act provides for three possible valuation dates: the date the condemnor takes possession of the property being condemned either in whole or in part, *N.J.S.A.* 20:3–30(a); the date on which the condemnation action is commenced, *N.J.S.A.* 20:3–30(b); and "the date on which action is taken by the condemnor which substantially affects the use and enjoyment of the property by the condemnee," *N.J.S.A.* 20:3–30(c).[1]  Just compensation for the condemnee is determined as of the earliest of those dates. *N.J.S.A.* 20:3–30.

At issue is whether a letter written by a municipality to a potential condemnee "substantially affect[ed]" the value of the property, thereby setting the valuation date pursuant to *N.J.S.A.* 20:3–30(c). The trial court determined that the date of the letter, which stated that the municipality may acquire the property owner's land for use as a community park, had obtained financing for the acquisition, and intended to obtain a prompt appraisal of the property's value, constituted the proper date for valuing the property. The Appellate Division reversed the trial court's decision, holding that the letter was "merely a preliminary step to a potential future condemnation." 285 *N.J.Super.* 436, 451, 667 *A.*2d 362 (1995). We granted certification, 145 *N.J.* 371, 678 *A.*2d 712 (1996), and now reverse.

## I

In 1987, Stuart Nierenberg, Marilyn Nierenberg, Philip Kramer, Sol Kramer, and Ely Kramer formed Princeton Manor Associ-

---

[1] *N.J.S.A.* 20:3–30 was amended by *L.* 1996, *c.* 62, § 42, eff. Sept. 10, 1996, to include the following subsection:

(d) the date of the declaration of blight by the governing body upon a report by a planning board pursuant to section 38 of P.L.1971, c. 361 (C. 20:3–38), or, in the case of a property being maintained as an abandoned property for failure to remove the property from the abandoned property list, as provided pursuant to subsection c. of section 37 of P.L.1996, c. 62 (C. 55–19–56), if there was no declaration of blight, as of the date of expiration of the condemnee's right to appeal inclusion of the property on the abandoned property list.

ates. The purpose of the partnership was to develop a 50-acre tract of land owned by Yvette Nierenberg, Stuart's and Marilyn's mother. The Nierenbergs contemplated that Yvette would be given a sum certain for her property, while her adult children would receive, without financial obligation, proceeds from development of the property. Philip Kramer, a highly experienced real estate developer, would handle most of the responsibilities of development.

The property is zoned R–2 Residential by the Township of West Windsor (Township). That zoning permits single-family detached dwellings on three-quarter acre lots. R–2 zoning also allows open-space cluster developments as a conditional use if the lot size is at least 20,000 square feet and is served by either public water or public sewer. The subject property is serviced by public water and partially by public sewer.

At some time prior to 1987, the property, together with two contiguous parcels, was designated on the Township's Master Plan as a potential site for West Windsor's proposed Community Park. On July 8, 1987, Princeton Manor Associates purchased the property from Yvette Nierenberg for approximately $4,320,700, and Yvette simultaneously acquired an interest in the partnership.

In the months following the sale, Princeton Manor Associates prepared a plan for a forty-eight-lot residential subdivision of the property. The partnership spent approximately $25,000 in engineering costs preparing the plan. The final plan conformed with the municipal zoning ordinance. The partnership's attorney Peter Buchsbaum would later testify that it was "a relatively straightforward submission." The partnership's subdivision application was presented to the Township on May 13, 1988.

By letter dated May 19, 1988, the Township's Director of Community Development acknowledged receipt of the partnership's application. The Director notified the partnership that certain administrative requirements had not been met, such as payment of a required application fee/security deposit and submission of additional copies of certain documents. On June 3, 1988,

the Township forwarded a second letter, stating that "on further examination of the ... development application," the Township determined, apparently inaccurately, that the subject property in its entirety was not within the area served by public sewers. Therefore, percolation tests and soil log data for the property would be required before the application would be considered further.

The partnership was then faced with a choice. It could wait at least seven months for the seasonal high water period to conduct percolation tests, at an approximate cost of $40,000. Alternatively, the partnership could attempt to have the municipal sewer plan amended to provide service to the entire property. The partnership was studying the sewer plan amendment process when Yvette Nierenberg received a certified letter from Robert Bruschi, the Township Administrator. That letter, dated July 29, 1988, read:

Dear Ms. Nierenberg:

*TOWNSHIP MASTER PLAN/COMMUNITY PARK*

Enclosed is a copy of the facilities portion of the Township Master Plan. Three (3) properties to comprise a potential Community Park have been designated in it. In conjunction with the Master Plan, the Township applied to the New Jersey Green Acres for a low-interest loan for the properties' purchase. Several months ago, the Governor notified us of our award of a $3 million loan to supplement the Township's funding for purchasing this property. On June 27, 1988, the Township Committee authorized the Mayor to enter into an agreement with New Jersey Green Acres to fund this acquisition.

Therefore, this is formal notification that West Windosr [sic] Township may acquire this property for the purpose of establishing a Community Park.

Shortly, the Township along with independent appraisers and the Green Acres Office will determine a fair-market value for the property.

In the interim, I am available to answer your questions regarding the above items.

Upon review of the July 29 letter, Buchsbaum advised his clients that they could not secure Township approval for enlargement of the sewer system when the Township appeared intent on condemning the property.

On August 23, 1988, an appraiser retained by the Township wrote to Yvette Nierenberg, stating "[t]his firm has been retained by the Township of West Windsor to make an appraisal on the above captioned property which is part of the Community Park

Project." That letter stated that Nierenberg could accompany the appraiser during his inspection of the subject property. On September 2, 1988, a second appraiser hired by the Township wrote to Nierenberg, stating that "[w]e have been retained by the Township of West Windsor to independently appraise the property to be acquired from you." Shortly thereafter, the appraisers inspected the property and requested that Buchsbaum forward information concerning the terms of the 1987 contract of sale.

On February 16, 1989, Buchsbaum wrote to Bruschi, stating:

Confirming our previous conversation, we have found it impossible, as a practical matter, to proceed with the development plans previously filed on the above-referenced property because of the Township's statement that it intends to acquire the property for a park. However, the matter has now been pending some six months, but we have not even received an appraisal or any form of offer.

We can not have our land rendered unusable while the Township considers the matter. This is, in fact, what has occurred over the last six months, even though we have expressed a willingness to discuss the issue with the township.

Bruschi responded:

As I have explained to you in our conversation on the telephone approximately two weeks ago, the Township is not in the position to begin any negotiations with the property owners until such time as we have received the fair market value from the Green Acres Office at the State of New Jersey. As soon as this is received by the Township, we will begin our discussions with the property owners involved, and you will be notified at that point.

In March 1989, the Township attorney Michael Hartsough was informed that the Department of Environmental Protection, Division of Green Acres Land Acquisition (Green Acres) had approved the acquisition. On April 19, Hartsough sent a letter to Buchsbaum stating that Green Acres had accepted an appraisal valuing the property at $3,022,000. Hartsough reminded Buchsbaum that, pursuant to the Act, he had fourteen days to respond. However, Hartsough encouraged negotiations between the Township and the partnership, and granted several extensions to permit further negotiations.

As negotiations continued, it became apparent that grounds for compromise existed. After the Township received the appraisals for the properties to be acquired for the Community Park, it realized that it could not afford to both purchase the properties

and develop the park. Discussions began to center on a partial acquisition of the property by the Township with development of the remainder by the partnership. The partnership proposed, among other plans, a dedication of thirty-seven acres to the Township with townhouse development on the thirteen-acre remainder. West Windsor rejected that proposal, but suggested it might be amenable to a forty-eight-lot single-family-home development.

On September 5, 1989, West Windsor's Township Committee adopted a resolution accepting an offer by the partnership to sell thirty-seven acres to the Township for $1,250,000. The partnership would be permitted to complete a residential development of no more than sixty units on the remaining thirteen acres, subject to a rezoning of the property and planning board approval. The Township Park Planning Committee recommended against the rezoning, arguing that the planned development would be an excessively intensive use of the remainder. On August 15, 1990, the Township Committee declined to approve the zoning ordinance amendment necessary to permit development of the remainder.

On August 29, 1990, Buchsbaum wrote to Hartsough to confirm that the "upset price" for purchase of the entire property was $3.3 million dollars. Buchsbaum and Hartsough had negotiated that "upset price" in the event that the zoning amendment failed. In his reply letter, Hartsough observed that "the Township Committee last evening in closed session agreed to the purchase of the Nierenberg tract for $3.2 million." Hartsough further noted that the Township Committee intended to introduce a bond ordinance authorizing the debt necessary to consummate the transaction. That bond ordinance was eventually defeated.

On December 12, 1990, Hartsough wrote to Buchsbaum indicating that, although the Township still desired to have the property included in the plans for the Community Park, the Township would require a "price ... more reasonable in terms of current economic conditions." Upon receipt of that letter, Buchsbaum advised his clients that the Township was stalling the condemna-

tion process in order to lower its acquisition costs. He recommended that the partnership file suit.

On January 22, 1991, the partnership filed a complaint in the Law Division seeking, among other relief, just compensation for the Township's alleged destruction of the value of its property or, alternatively, specific performance of its prior agreement with the Township whereby the partnership would receive $1,250,000 and the property would be rezoned to permit construction of no more than sixty units on thirteen acres. While the lawsuit was pending, the Township continued to express its interest in acquiring the property. It arranged for new appraisals and continued to negotiate with the partnership.

Those negotiations produced a new plan whereby the partnership would retain thirty-seven acres on which a thirty-four-lot subdivision would be permitted. The Township would acquire the remaining thirteen acres of the property. That proposal would require no zoning change or variance. The Township issued a pre-condemnation letter pursuant to *N.J.S.A.* 20:3–6, stating its intent to acquire the thirteen-acre portion of the property. On May 29, 1992, the parties entered into a contract pursuant to which the Township thereafter acquired the thirteen acres for $700,000. The contract contained the following language:

WHEREAS Buyer's planner and engineer have conducted a preliminary review of a concept plan [for development of the remaining thirty-seven acres] ... and both have indicated no objection to the lots and layout as proposed in the concept plan provided that all ordinance standards are met at the time of an actual application for development.

The contract also contained language indicating that execution of the terms of the contract would result in a stipulation of dismissal of the pending lawsuit. The final paragraph of the contract indicated that "[e]xecution of this Contract shall not bind the Township and the West Windsor Planning Board to any development application by the Seller in the future." Title to the thirteen acres passed to the Township on June 25, 1992.

On July 17, 1992, the West Windsor Township Committee met and adopted a resolution authorizing the Township to take action

to condemn the thirty-seven acres still owned by the partnership. Two months later, the Township offered the partnership $1.7 million for the property. That offer was rejected. On March 1, 1993, the Township adopted an ordinance authorizing the institution of condemnation proceedings. The partnership declined a subsequent offer of $1,210,000. On May 3, 1993, the Township filed a complaint for condemnation.

The sole issue at trial concerned the date on which the property was to be valued pursuant to *N.J.S.A.* 20:3–30. The partnership presented Steven Segal, an expert real estate consultant with substantial experience in the valuation of real estate in Mercer County. Segal testified that the July 29, 1988, letter had substantially affected the use and enjoyment of the property, as no developer would continue attempts to develop the property while threatened with condemnation. Segal explained that, in 1988, the real estate market had been at its peak, and prudent developers would have bypassed the Nierenberg property for other, unencumbered, properties. Segal testified that the letter had diminished the property's market value by at least twenty-five percent.

The Township presented the expert testimony of Russell Sterling, a real estate appraiser and consultant. Sterling had conducted a marketability study that indicated that the growth in residential development that had typified the early 1980s had ended by 1986. Sterling testified that, in 1988 and 1989, an excess of residential lots had been available in the Township and surrounding areas. Therefore, Sterling concluded that the letter had not substantially affected the property. Rather, the value of the property had decreased after July 1988 because of market conditions.

After hearing testimony from five witnesses and examining 138 exhibits, the trial court issued a comprehensive opinion concluding that the appropriate date of valuation was July 29, 1988, the date of the letter. The court first concluded that the standard set forth by *N.J.S.A.* 20:3–30(c) "does not require a showing of governmental action which substantially destroys the beneficial use of private

property, but only action which substantially affects it." Next, the court observed that the governmental action taken by the municipality included not only a "single, discrete act," but also "an action which was a culmination of a number of earlier actions."

The court then made enumerated findings of fact:

(1) The letter written to defendant Yvette Nierenberg was on West Windsor stationery, was signed by Robert W. Bruschi, Township Administrator, was sent certified mail-return receipt requested, and was stated to be "formal notification." Copies were sent to the Township Attorney, the Assistant Township Administrator/Clerk, and the funding agency, New Jersey Green Acres. Either lawyer or layman reading this letter would view it as an official action on a matter of great significance. These aspects of the letter lead to the conclusion that it is much more than a simple letter advising defendant, Nierenberg, of her right to accompany an appraiser on his inspection.

(2) While the letter uses the word "may" in describing the purpose of the notification ("that West Windosr (sic) Township *may* acquire this property"), the word "may" is so overwhelmed by the other aspects of the letter as to justify a conclusion of a predetermination on the part of plaintiff to take the action described. This is especially so since the "formal notification" is not a required action if no decision has been made by a governmental body to exercise its right of eminent domain.

(3) Accompanying the letter and referred to therein was a copy of the map entitled "Community Facilities Plan" which included defendants' property. Also included with the letter was "a copy of the facilities portion of the Township Master Plan," pages 77 through 94 inclusive, discussing in detail the construction of a public park on defendants' property, among others. The letter was obviously intended to impress Nierenberg with the advanced stage of plaintiff's plan to use defendants' property for public purposes.

(4) The letter states in some detail that funding for the acquisition of defendants' property was available, reciting the source of the money and actions taken to obtain it. It advises defendant, Nierenberg, that the money was to come from a $3,000,000 low-interest loan from the Green Acres program pursuant to notification from the Governor of New Jersey that the award of the loan had been approved. The $3,000,000 was described as a supplement to funding by plaintiff, indicating that additional money was also available. The money was said to be "funding for purchasing this property," referring to three properties of which defendants' property was one, shown on the Master Plan. A reasonable conclusion from a reading of this portion of the information is that a governmental body which has sent a letter advising that it has sought and successfully obtained a $3,000,000 low-interest loan to purchase properties for a public park and which states it has supplemental funding for that purpose, seriously intends to acquire the property described. This conclusion is reinforced by the statement, "On June 27, 1988, the Township Committee authorized the Mayor to enter into an agreement with New Jersey Green Acres to fund this acquisition." The words "fund this acquisition," indicate an intention to do so.

(5) Finally, the letter states that a determination of the fair market value of defendants' property is going to be made, and that three different groups are going to make that determination, "the township," "the Green Acres office," and "independent appraisers," an indication that more than one appraiser was to be involved. The only reason for plaintiff to determine the fair market value of defendants' property would be to purchase the property, and a statement of three groups being involved in that decision is indicative of a firm intent to acquire the property.

The court reasoned that the Township's letter impeded development, thereby significantly diminishing the possibility that the land would be put to its highest and best use as a residential development. The court observed that the only apparent alternative use would be agricultural. The court also relied on the "conservative" estimate of the partnership's real estate expert that the letter had devalued the property by twenty-five percent, noting that "[t]here is no doubt that this is so."

The court rejected the Township's argument that any effect that the letter may have had was temporary only, as the parties eventually settled their subsequent inverse condemnation case. The court found that the settlement "constituted . . . an acquisition of a portion of the property for which funding was then available." The court noted that the evidence adduced at trial indicated that the Township's proprietary attitude towards the property had not abated. The threat of condemnation continued uninterrupted, as was demonstrated by the Township Committee's subsequent actions. Continuity of the substantial effect of the letter on defendant's property was established. Therefore, the court concluded that the date of that letter—July 29, 1988—was the appropriate valuation date.

On April 29, 1994, five days after the entry of the trial court's Order setting July 29, 1988, as the date of valuation, the Township moved before the trial court to bar Yvette Nierenberg and the partnership under the doctrines of res judicata and collateral estoppel from relying on the July 29, 1988, valuation date. The Township's core argument was that, because the inverse condemnation complaint was dismissed with prejudice by a consent judgment, the consent judgment should be considered an adjudication on the merits that would preclude further judicial review. The

court denied the motion, holding that the consent judgment was not the equivalent of an adjudication but rather should be regarded as akin to a stipulation of dismissal.

The Appellate Division reversed the decision below. 285 *N.J.Super.* 436, 667 *A.*2d 362 (1995). That court held that the letter did not substantially affect the partnership's use and enjoyment of the property within the meaning of *N.J.S.A.* 20:3–30(c). *Id.* at 450, 667 *A.*2d 362. The court reasoned:

> The letter contained no promise by the Township that it would ultimately condemn the property. Instead, the Township indicated it "may" acquire the property for development of a community park in accordance with the master plan and that it had obtained a loan commitment to enable it to take this course. Prior to the creation of Princeton Manor and the purchase of the property, Philip Kramer was aware of the fact that the land was a potential site for a community park. The master plan made that potential crystal clear. So too, Princeton Manor either knew or should have known that the Township had obtained a low interest loan in order to acquire and develop the property as a park and that Green Acres funding was available. The Township Committee's resolution was a matter of public record. Clearly, these events did not dissuade Princeton Manor from proceeding with its plan for development.
>
> [*Id.* at 450–51, 667 *A.*2d 362.]

The court determined that the letter "did not earmark the property for taking. Instead, it was merely a preliminary step to a potential future condemnation." *Id.* at 451, 667 *A.*2d 362.

The Appellate Division contrasted *N.J.S.A.* 20:3–30(c) with *N.J.S.A.* 20:3–38, which provides that "[t]he value of any land or other property being acquired in connection with development or redevelopment of a blighted area shall be no less than the value as of the date of the declaration of blight by the governing body upon a report by the planning board." In enacting that provision, the Legislature presumed that a declaration of blight would adversely affect value. *See Newark Hous. Auth. v. Ricciardi,* 176 *N.J.Super.* 13, 19, 422 *A.*2d 78 (App.Div.1980). The Appellate Division observed that the Legislature did not impose on condemnees the burden of proving that an actual decline in value between the declaration of blight and the taking date was related to the declaration. *Ibid.* However, in contrast, the court noted that in cases not involving a declaration of blight, the Legislature required the condemnor to engage in preliminary activities but did

not indicate that any of those activities necessarily would set the date of valuation. 285 *N.J.Super.* at 452, 667 *A.*2d 362. The court concluded that if such preliminary activities were to set the valuation date, the Township would be forced "to pay an unreasonable price." *Ibid.*

The Appellate Division further found that the partnership could have perfected its application for major subdivision approval, thereby forcing the Township to determine its acquisition plans. *Id.* at 452, 667 *A.*2d 362. While the court acknowledged that the partnership would have incurred significant expenses either by conducting percolation tests or by seeking an amendment to the sewer plan, it labeled them "business risks that would have confronted Princeton Manor in any event." *Ibid.* Therefore, the court ruled that any loss occasioned by a diminution in the value should be borne by the partnership and not the Township taxpayers. *Id.* at 453, 667 *A.*2d 362. The court reversed and remanded to the Law Division for further proceedings consistent with its opinion. *Ibid.*

While the state appeals were pending, Yvette, Stuart, and Marilyn Nierenberg, together with the partnership, filed suit in United States District Court against the Township, the Mayor, and the Township Committee. Plaintiffs sought relief pursuant to 42 *U.S.C.A.* § 1983 and the New Jersey common-law actions for breach of contract and fraudulent misrepresentation. The complaint was dismissed on defendants' motion for summary judgment. The court found that plaintiffs' § 1983 claims were time-barred, and declined to exercise supplemental jurisdiction over the claims arising under state law. On February 20, 1997, the Third Circuit Court of Appeals entered a Judgment affirming the decision of the District Court. 107 *F.*3d 863 (1997).

## II

### A

When private property is condemned for public use, the condemnor is required to pay "just compensation" to the property

owner. *U.S. Const.* amend. V; *N.J. Const.* art. I, ¶ 20. The previous landowner is entitled to that amount of money that will make him whole. *See, e.g., Bowers v. Town of Bloomfield,* 81 *N.J. Eq.* 163, 165, 86 *A.* 428 (E. & A.1913); *Port of New York Auth. v. Howell,* 59 *N.J.Super.* 343, 347, 157 *A.*2d 731 (Law Div.1960), *aff'd,* 68 *N.J.Super.* 559, 173 *A.*2d 310 (App.Div.), *certif. denied,* 36 *N.J.* 144, 174 *A.*2d 927 (1961). Eminent domain proceedings are therefore required to produce a "fair market value" for the subject parcel. *State v. Gorga,* 26 *N.J.* 113, 115, 138 *A.*2d 833 (1958); *State v. Cooper,* 24 *N.J.* 261, 268, 131 *A.*2d 756, *cert. denied,* 355 *U.S.* 829, 78 *S.Ct.* 41, 2 *L.Ed.*2d 42 (1957). "Fair market value" as applied to condemnation proceedings was explained by this Court in *State v. Nordstrom:*

> Although a sum of money equal to "fair market value" cannot always be a perfect measuring stick for determining the worth of property to a landowner, the State must try as nearly as possible, employing objective standards, to replace the land which has been earmarked for public use with equivalent public funds.
>
> [54 *N.J.* 50, 53, 253 *A.*2d 163 (1969).]

One of the primary objectives of the Act was to integrate and standardize the more than 300 statutes then existing authorizing the exercise of eminent domain. *County of Monmouth v. Wissell,* 68 *N.J.* 35, 39–40, 342 *A.*2d 199 (1975); *see also State v. Jones,* 27 *N.J.* 257, 265, 142 *A.*2d 232 (1958) (Burling, J., concurring) (requesting legislative clarification of how date of valuation should be set when taking, by statute, precedes initiation of condemnation proceedings). The Eminent Domain Revision Commission (Commission) was created in 1962 to suggest revisions to the then-existing Eminent Domain Act. *County of Monmouth, supra,* 68 *N.J.* at 38, 342 *A.*2d 199. The Commission produced its report in 1965. *Id.* at 38–39, 342 *A.*2d 199. That report served as the foundation for the current Act. *Id.* at 39, 342 *A.*2d 199.

Article V of the report, entitled "Date as of Which Compensation Shall be Determined," contains the following comment:

> Property owners are ... affected by public announcements by agencies of proposed projects, highway routes and the like. Years may elapse between the date of the announcement and the consummation, and the final plan may and probably will differ substantially from the original scheme. The Commission

realizes that a public body must be afforded a wide range of time within which to reach its final conclusion, and to this end, will publicize various thoughts to test public opinion. But some consideration should be given to the persons whose property is thus placed in the test tube, and boiled in the caldron of public and political bickerings. It is said that this is the price which is paid for the benefit of living in a democracy. But why should these property owners pay the entire cost? Should not the benefited public also share?

. . . .

The Commission . . . suggests that any increase or decrease in the value of property caused by administrative actions, or public announcements of proposed public improvements, (other than that due to physical depreciation within the reasonable control of the owner) shall be disregarded in determining the compensation for the taking, and that *compensation shall be fixed as of the date the action of the taking body shall substantially affect the use and enjoyment [sic] of the property.*

[*Report of Eminent Domain Revision Commission of New Jersey* 27–28 (1965) (emphasis added).]

Shortly before passage of the 1971 Act, this Court decided *Jersey City Redevelopment Agency v. Kugler,* 58 *N.J.* 374, 277 *A.*2d 873 (1971). That case involved a constitutional challenge to certain 1967 amendments to the Blighted Area Act, *N.J.S.A.* 40:55–21.1 to -.14 (repealed 1992), and the Eminent Domain Act, *N.J.S.A.* 20:1–1 to 4–22. *Id.* at 376, 277 *A.*2d 873. Those amendments dealt with the valuation of property acquired in eminent domain proceedings as part of the development or redevelopment of blighted areas. *Id.* at 376–77, 277 *A.*2d 873. Before the statutory amendments, the statutes provided that value should be frozen as of the date of commencement of the condemnation action. *Id.* at 378, 277 *A.*2d 873. Both amendments provided that " 'the value of any property sought to be acquired shall be fixed and determined to be no less than the value as of the date of the declaration of blight. . . .' " *Id.* at 377, 277 *A.*2d 873 (quoting *L.* 1967, *c.* 218, § 1 (repealed 1971) and *L.* 1967, *c.* 217, § 1 (repealed 1992)).

The parcel in question was declared blighted nine years before condemnation proceedings were instituted by plaintiffs Jersey City Redevelopment Agency and its Commissioner. *Id.* at 376, 658 *A.*2d 1230. Plaintiffs, undoubtedly faced with higher acquisition costs under the new statutes, instituted suit contending that

the Legislature could not compel the courts to adopt a fictitious taking date rather than the actual taking date. *Id.* at 377, 658 *A.*2d 1230.

The Court defined the issue as "the problem of the effect in subsequent condemnation cases of the earlier announcement by a public agency that a public improvement was planned for a particular location or area." *Id.* at 379, 658 *A.*2d 1230. The generally prevailing rule at that time dictated that any depreciation or inflation due to a public announcement should not be reflected in the value set for the parcel. *Ibid.* The Court held that the statutory amendments at issue were consonant with that rule, because they prescribed that the taken land be valued as of the date of the declaration of blight, which would probably cause a decrease in value. *Id.* at 383, 658 *A.*2d 1230. The court found that the Legislature had merely prescribed a minimum base for compensation and had neither invaded the authority of the judiciary nor violated constitutional guarantees of just compensation. *Id.* at 384–85, 658 *A.*2d 1230.

A few months after the effective date of the Act, the Law Division decided *State v. Milkon Realty, Inc.,* 119 *N.J.Super.* 156, 290 *A.*2d 461 (1972) and *East Rutherford Industrial Park v. State,* 119 *N.J.Super.* 352, 291 *A.*2d 588 (1972). In *Milkon Realty,* the court found that the "clear" legislative intent of *L.* 1971, *c.* 361, § 30 (codified at *N.J.S.A.* 20:3–30) was "to fix the valuation date of ultimately condemned property as of the time any action by the condemnor may reasonably be deemed to thereafter affect the fair market value thereof." 119 *N.J.Super.* at 162, 290 *A.*2d 461. Similarly, in *East Rutherford Industrial Park,* the court found that injury incurred by public announcements and publicity surrounding the proposed site of a sports complex "may be taken into consideration in awarding damages." 119 *N.J.Super.* at 361, 291 *A.*2d 588; *see also Housing Auth. v. Atlantic City Exposition, Inc.,* 62 *N.J.* 322, 328–30, 301 *A.*2d 441 (1973) (reiterating, in dicta, that a proper eminent domain valuation disregards any depreciation or inflation due to proposed public project).

*New Jersey Sports & Exposition Authority v. Giant Realty Associates*, 143 *N.J.Super.* 338, 362 *A.*2d 1312 (Law Div.1976), is the most recent case addressing *N.J.S.A.* 20:3–30(c). In *New Jersey Sports & Exposition Authority*, the court considered whether certain actions taken by the Hackensack Meadowlands Development Commission (HMDC) and the New Jersey Sports and Exposition Authority (Authority) deprived Giant Realty Associates (Giant Realty) of the beneficial use and enjoyment of its property. *Id.* at 343, 362 *A.*2d 1312. In April 1972, Giant Realty applied to the HMDC for a zoning certificate and building permit in order to use its property for a gas station. *Id.* at 344, 362 *A.*2d 1312. One month later, Giant Realty entered into a twenty-year lease with Amerada–Hess Corporation under which the corporation would operate a gas station on the property. *Id.* at 344–35, 362 *A.*2d 1312. On June 7, 1972, the HMDC denied Giant Realty's application. *Id.* at 345, 362 *A.*2d 1312. In April 1973, the Authority instituted eminent domain proceedings to condemn Giant Realty's property. *Ibid.* The date of valuation became a contested issue during those proceedings. *Id.* at 345–46, 362 *A.*2d 1312. In applying subsection (c) to fix the date of valuation, the court first outlined the legislative policy underlying the subsection. *Id.* at 347–48, 362 *A.*2d 1312. The court found that the dominant theme of Article V of the Commission's report concerned the "freezing" of value once an event occurs that causes a significant fluctuation in value of the condemned parcel. *Id.* at 347, 362 *A.*2d 1312. The court noted that one of the objectives of subsection (c) is to protect the condemnee from a diminution in value resulting from "the cloud of condemnation" being placed on the property by a potential condemnor; another objective is to insulate the condemnor from "the ravages of an inflationary spiral." *Id.* at 348, 362 *A.*2d 1312.

Describing the standard governing application of subsection (c), the court stated: "A substantial effect upon the use and enjoyment of property is occasioned when the condemnor takes action which directly, unequivocally and immediately stimulates an upward or downward fluctuation in value and which is directly

attributable to a future condemnation." *Id.* at 353, 362 *A.*2d 1312. A "clearly observable and direct interference which is directly related to condemnation" must exist if a substantial effect is to be found. *Id.* at 353–54, 362 *A.*2d 1312. The court concluded that the June 7, 1972, letter of denial of Giant Realty's development application substantially affected Giant Realty's use and enjoyment of the property, observing that the denial of the building application presented a clear example of an event that precipitates a fluctuation in value. *Id.* at 355, 362 *A.*2d 1312.

The result reached in *New Jersey Sports & Exposition Authority* is consistent not only with New Jersey precedent, *see* John M. Payne, *A Survey of New Jersey Eminent Domain Law (With Academic Interruptions)*, 30 *Rutgers L.Rev.* 1111, 1139 (1977) (explaining that *New Jersey Sports & Exposition Authority* "[made] manifest a trend in New Jersey law that ha[d] been discernible for some time"); it is also consistent with the long-standing rule applied by courts in other jurisdictions. *See, e.g., United States v. Virginia Elec. & Power Co.,* 365 *U.S.* 624, 636, 81 *S.Ct.* 784, 792, 5 *L.Ed.*2d 838, 849 (1961) (holding that "[t]he court must exclude any depreciation in value caused by the prospective taking once the Government 'was committed' to the project"); *Murray v. United States,* 130 *F.*2d 442, 444 (D.C.Cir.1942) (approving jury instruction that "in determining the compensation for the land being condemned they shall not take into consideration any effect, whether by enhancement or diminution, which the purpose or intention of the government to acquire this property for public use may have had upon its value"); *Klopping v. City of Whittier,* 8 *Cal.*3d 39, 104 *Cal.Rptr.* 1, 500 *P.*2d 1345, 1355–59 (1972) (establishing that, when condemnor acts unreasonably in issuing precondemnation statements, constitutional concerns mandate that owner be compensated); *Dade County v. Still,* 377 *So.*2d 689, 690 (Fla.1979) (reiterating that "a condemning authority cannot benefit from a depression in property value caused by a prior announcement that it will be taken for a public project"); *State v. Sovich,* 253 *Ind.* 224, 252 *N.E.*2d 582, 588 (1969) (holding that neither increase nor decrease in value precipitated by knowl-

edge of government project is to be considered in valuing property); *Lipinski v. Lynn Redev. Auth.*, 355 *Mass.* 550, 246 *N.E.*2d 429, 432 (1969) (establishing that landowner entitled to value of property unaffected by knowledge of impending taking); *Michigan State Highway Comm'n v. L & L Concession Co.*, 31 *Mich. App.* 222, 187 *N.W.*2d 465, 467 (1971) (finding that established rule of condemnation law is that valuation is determined without regard to change in value attributable to threat of condemnation); *County of Clark v. Alper*, 100 *Nev.* 382, 685 *P.*2d 943, 948–49 (1984) (holding improper consideration of testimony concerning value of condemned property after city plan predicting taking of property was published); *In re 572 Warren Street*, 58 *Misc.*2d 1073, 298 *N.Y.S.2d* 429, 433 (Sup.Ct.1968) (holding that "[t]he City may not by virtue of a condemnation and by its own action cause a depreciation in value of property to be condemned and then claim that just compensation is that depreciated value"); *Raleigh–Durham Airport Auth. v. King*, 75 *N.C.App.* 57, 330 *S.E.*2d 622, 625 (1985) (holding that evidence of longstanding announcements by condemning authority was relevant to show how proposed condemnation had chilled development, as condemnor could not benefit from any decrease in property value attributable to threat); *In re Appropriation of Property of Bunner*, 28 *Ohio Misc.* 165, 276 *N.E.*2d 677, 680–87 (Prob.Ct.1971) (asserting that change in property value due to general knowledge of imminence of condemnation is to be disregarded in determining value). *See generally Model Eminent Domain Code* § 1005, 13 *U.L.A.* 91 (1986) (stating that fair market value of property does not include increase or decrease in value caused by proposal of improvement or project for which property is taken); Julius L. Sackman, 4 *Nichols' The Law of Eminent Domain* § 12B.17[7] (3d ed.1989) (stating that *Model Eminent Domain Code* § 1005, *supra*, follows general rule demanding that effects of proposed taking are not to be considered in determining market value of land); Annotation, *Depreciation in Value, from Project for Which Land Is Condemned, as a Factor in Fixing Compensation*, 5 *A.L.R.*3d 901, 903–06 (1966) (collecting cases indicating that where value of property has

declined between announcement and actual taking, landowner is allowed compensation representing original value of property, or, at least, something more than depreciated value).

B

In *Rova Farms Resort, Inc. v. Investors Insurance Co. of America,* this Court set forth the standard of review for non-jury civil actions:

Considering first the scope of our appellate review of judgment entered in a non-jury case, as here, we note that our courts have held that the findings on which it is based should not be disturbed unless " * * * they are so wholly insupportable as to result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter. That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance. Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence.

[65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974) (citations omitted).]

Those principles continue to be consistently applied. *See, e.g., Cohen v. Radio–Electronics Officers Union,* 146 *N.J.* 140, 157, 679 *A.*2d 1188 (1996); *Walles v. Walles,* 295 *N.J.Super.* 498, 513, 685 *A.*2d 508 (App.Div.1996); *see also Caldwell v. Haynes,* 136 *N.J.* 422, 432, 643 *A.*2d 564 (1994) (stating that appellate court should defer to decisions based on trial judge's "feel of the case"); 5 *Am.Jur.2d Appellate Review* § 662 at 337 (1995) (reiterating that reviewing courts generally may not set aside findings of fact merely because evidence permits findings other than those made below, or because appellate court might reach different result); *cf. Manalapan Realty, L.P. v. Township Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) (cautioning that, despite *Rova Farms,* trial court's legal interpretations not entitled to special deference).

The rationale underlying that limited scope of appellate review is that a trial judge's findings are substantially influenced by his or her opportunity to hear and see the witnesses and to get a "feel" for the case that the reviewing court can not enjoy. *State v. Whitaker,* 79 *N.J.* 503, 515–16, 401 *A.*2d 509 (1979). This Court has recognized that "[b]ecause a trial court 'hears the case, sees

and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." *Pascale v. Pascale*, 113 *N.J.* 20, 33, 549 *A.*2d 782 (1988) (quoting *Gallo v. Gallo*, 66 *N.J.Super.* 1, 5, 168 *A.*2d 228 (App.Div.1961)). In practice, when the *Rova Farms* standard is applied and the reviewing court is satisfied that the trial court's findings could reasonably have been reached on sufficient credible evidence in the record, the decision below should not be disturbed. *Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 *N.J.Super.* 332, 338, 382 *A.*2d 933 (App.Div.), *aff'd*, 78 *N.J.* 320, 394 *A.*2d 360 (1978).

*State v. Johnson*, 42 *N.J.* 146, 199 *A.*2d 809 (1964), sets forth guidelines for our review of Appellate Division actions when that court determines that a trial court's findings of fact were wrong. Under *Johnson*, the Court first determines whether the Appellate Division "initially approached the review correctly." *Id.* at 163, 199 *A.*2d 809. If the Appellate Division did not conduct its review correctly, this Court's review will turn on whether agreement or disagreement with the trial court's findings resulted. *Ibid.* If agreement between the two tribunals exists, this Court then determines whether both courts were clearly in error. *Ibid.* If there was disagreement, the Court determines whether the Appellate Division was "manifestly mistaken" in ruling that the trial court "had gone too wide of the mark." *Ibid.; see also Sadofski v. Williams*, 60 *N.J.* 385, 396, 290 *A.*2d 143 (1972) (holding that "[a]s a second appellate tribunal, our function is the more limited one of determining whether the Appellate Division was right or wrong" in evaluating trial court's findings).

## III

In its opinion, the Appellate Division began its analysis by stating that "[t]his case does not involve a claim of inverse condemnation." 285 *N.J.Super.* at 446, 667 *A.*2d 362. The court observed that mere governmental plotting and planning does not constitute a taking; that governmental action often compromises a parcel's marketability; that even a substantial reduction in mar-

ketability does not trigger Fifth Amendment protections; and that proposed takings do not justify compensation merely because potential purchasers may therefore reject the property. *Id.* at 447–48, 667 *A.*2d 362.

Although we disagree with none of those observations, we note, as did the Appellate Division, that those principles are not dispositive of this appeal. The inquiry whether specific governmental action constitutes a taking does not determine whether a landowner's use and enjoyment of his or her property has been substantially affected by a future condemnor for the purpose of fixing the valuation date that governs the eventual condemnation proceeding. In an inverse condemnation case, the property owner is "required to show that there has been substantial destruction of the value of [his or her] property and that defendant's activities have been a substantial factor in bringing this about." *Washington Market Enters. v. City of Trenton,* 68 *N.J.* 107, 123, 343 *A.*2d 408 (1975); *see also Littman v. Gimello,* 115 *N.J.* 154, 164, 557 *A.*2d 314 (reiterating that inverse condemnation requires substantial or total destruction of beneficial use of property), *cert. denied,* 493 *U.S.* 934, 110 *S.Ct.* 324, 107 *L.Ed.*2d 314 (1989). The legislative standard under *N.J.S.A.* 20:3–30(c), however, requires only a showing that the governmental action has "substantially affect[ed]" the landowner's use and enjoyment of the subject property in order to fix the valuation date that governs the condemnation proceedings. That standard differs from the standard for determining when a government action constitutes a taking. *See New Jersey Sports & Exposition Auth., supra,* 143 *N.J.Super.* at 349, 362 *A.*2d 1312 ("It does not follow, however, that simply because the denial of Giant's development applications did not amount to a constitutional taking, such action cannot be said to have 'substantially affected' the use and enjoyment of the property insofar as a determination of a date of valuation is concerned."). Governmental action merely sufficient to set a date of valuation under subsection (c) need not support a cause of action for inverse condemnation.

The Appellate Division also noted that the partnership "could have pursued its development plan by perfecting its application for major subdivision approval, thus compelling the Township to determine whether to seek condemnation." *Id.* at 452, 667 *A.*2d 362. However, the critical issue in this appeal is not whether the partnership could have continued its attempts to develop the property, but whether the partnership's use and enjoyment of its property was substantially affected by the July 29 letter. Furthermore, while the partnership could have continued to seek development approval from the Township, the record indicates that any such attempt would have been futile. Partnership attorney Buchsbaum recognized as much when he informed the Township Administrator by letter that "we have found it impossible, as a practical matter, to proceed with the development plans previously filed on the above-referenced property because of the Township's statement that it intends to acquire the property for a park." Nor, given the cloud of condemnation over the property, could the partnership have sold the land at an economically feasible price to another developer. We decline to fault the partnership for not pursuing its development application in the face of overwhelming odds against approval. That course of action would have succeeded only in consuming substantial partnership assets with no commensurate benefit.

■ The question whether and when a landowner's use and enjoyment of his or her property has been "substantially affected" under *N.J.S.A.* 20:3–30(c) is a mixed question of law and fact. *See* 5 *C.J.S. Appeal & Error* § 703d (1993) ("Mixed questions of law and fact concern the application of a legal rule to the facts and the determination of whether the rule is satisfied."). The standard of review of the court's findings of fact is dictated by *Rova Farms, supra,* in which we emphasized that "[f]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." 65 *N.J.* at 484, 323 *A.*2d 495.

■ Among the trial court's factual findings were that the letter disclosed the Township's firm intention to acquire the property

and that, because of the letter, the property could not be put to its highest and best use as a residential development. The court also found that the Township's assertion of its plan to acquire the property and of its ability to finance the acquisition, as set forth in the letter, caused the property to be devalued by approximately twenty-five percent. Those factual findings by the trial court, amply supported as they were by substantial credible evidence in the record, should not have been rejected by the Appellate Division. *See generally Pioneer Nat'l Title Ins. Co., supra,* 155 *N.J.Super.* at 338, 382 *A.*2d 933 (holding that, if reviewing court is satisfied that trial judge's findings could reasonably have been reached on sufficient credible evidence in record, decision below should stand).

Applying the subsection (c) standard to those findings, the trial court concluded that the letter of July 29, 1988, had substantially affected the partnership's use and enjoyment of the property. Therefore, the court held that the fair market value of the property would be determined as of that date pursuant to *N.J.S.A.* 20:3–30(c).

Whether the partnership's inability to develop the property, which resulted in the twenty-five percent diminution in the property's value, constituted a "substantial" effect for purposes of subsection (c) is more of a legal than factual question. Although the court in *New Jersey Sports & Exposition Authority* further refined the inquiry by stating that "[a] substantial effect upon the use and enjoyment of property is occasioned when the condemnor takes action which directly, unequivocally and immediately stimulates an upward or downward fluctuation in value and which is directly attributable to a future condemnation," 143 *N.J.Super.* at 353, 362 *A.*2d 1312, even that explanation falls short of prescribing a precise matrix against which subsequent cases may be judged. In our view, the legislative objective was to identify events that affected the value of property so significantly that it would be unfair, either to the condemnor or the condemnee, to allow the

post-event fluctuation in value to be reflected in the condemnation award.

In fixing the date of the Township's letter as the valuation date for condemnation purposes, the trial court determined as a matter of law that the letter's impact on the value of the partnership's property was of such consequence and magnitude as to render use of the date of taking for valuation purposes unfair to the condemnee. In contrast, establishing valuation as of the date of the Township's letter would avoid imposing on the condemnee the loss in value that the court found to be attributable to the letter. Although this Court could adopt a more restrictive legal standard that could overcome the trial court's conclusion, we decline to do so. We find no justification for requiring, as a matter of law, more than a twenty-five percent diminution in value in order to trigger the valuation mechanism of *N.J.S.A.* 20:3–30(c).

We conclude that the trial court properly found that the date of the Township's letter set the date of valuation. That determination should not discourage municipalities from responsibly notifying potential condemnees of an intention to condemn. *See N.J.S.A.* 20:3–6 (dictating that condemnor must engage in bona fide negotiations that include written offer to purchase before initiating condemnation proceedings). Nor should our disposition be viewed as penalizing condemnors. The objective of *N.J.S.A.* 20:3–30(c) is neither to reward nor to punish either party to a condemnation. Rather, it is to establish value at the time that the condemnor's actions substantially affect the landowner's use and enjoyment of his or her property. *See New Jersey Sports & Exposition Auth., supra,* 143 *N.J.Super.* at 349, 362 *A.*2d 1312 (finding legislative policy to freeze value of property once event occurs that causes fluctuation in value of parcel). The same principle applies whether the governmental action prompts an increase or a decrease in the value of the property. *Id.* at 348, 362 *A.*2d 1312 (holding that *N.J.S.A.* 20:3–30(c) "also is designed to insulate the condemnor from the ravages of an inflationary spiral"); *see also Report of Eminent Domain Revision Commission*

*of New Jersey, supra,* at 28 ("The Commission therefore suggests that any *increase or decrease* in the value of property caused by administrative actions, or public announcements of proposed public improvements ... shall be disregarded in determining the compensation for the taking...." (emphasis added)). Condemnors are not prejudiced by *N.J.S.A.* 20:3–30(c) and, in fact, may benefit from its application in instances where governmental action precipitates a substantial increase in the value of the subject property.

## IV

We reverse the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings consistent with this opinion.

O'HERN, J., dissenting.

This case is more about failed intentions than evil ones. The Appellate Division concluded that a July 29, 1988 letter from the Township evidencing interest in a property was only a preliminary step in the condemnation process and not an event that substantially interfered with the use and enjoyment of the property. The Court has instead determined that the letter, though followed by years of negotiation, revealed an interest in acquiring the property so strong as substantially to interfere with the owner's rights. The Court has held, in effect, that the date for valuation of a property under condemnation should be the earliest date when a public body demonstrates a firm interest in acquiring a property. I agree with the Appellate Division and therefore dissent.

## I

This is the third claim by Princeton Manor Associates (PMA) that the precondemnation activities of the Township of West Windsor had substantially interfered with its property rights. The two others were dismissed with prejudice. This claim for an earlier date of taking also should be dismissed. A federal action

was dismissed on statute of limitations grounds and is not particularly instructive. A prior state court action, which alleged a substantive agreement between the parties on the value of the property long after July 1988, and a substantial interference with PMA's property rights, was dismissed with prejudice in April 1992.

We need not debate what *res judicata* effect should be given to those determinations. Those prior proceedings amply illustrate that this entire situation is simply the result of a long drawn-out process in which the Township attempted, in good faith, to acquire this fifty-acre parcel of land. At no point until actual condemnation did the Township substantially interfere with PMA's use and enjoyment of the property.

There are several indicia of the Township's good faith. First, despite PMA's contention that the July 1988 letter had substantially interfered with the use and occupancy of its property, the March 1989 Green Acres Certification of Fair Market Value specifically recited that the highest and best use of the property was as residential property. There was no suggestion in that certification that there would be any negative effect on the property's value because the property had been designated as a community park, or even because the Township had indicated its intent to acquire the property. Had the Township been attempting to take advantage of PMA, it would have valued the property as undevelopable land. The Certification of Fair Market Value prepared by Green Acres and furnished to PMA placed the property in the second tier of a three-tier valuation system. The certification noted that "the second tier is made up of properties placed under contract of sale contingent upon approvals for development which produces values in the mid range." The certification did not value the property as raw land, the lowest tier. Nor did it value the property as having received preliminary or final approval, a determination that would reflect the highest tier value. Thus, if the July 1988 letter had substantially interfered with the best use

and enjoyment of the land (as residential property), that conclusion was not reflected in what the Township was willing to pay.

Unfortunately for them, the property owners decided to make a counter-offer that would have allowed them to sell part of the property and to construct 115 town homes on a retained portion of the property. The Township offered to pay over $3 million for the fifty acres. This offer in turn provoked another response from the Township that would have permitted PMA to construct forty-eight homes on thirteen acres to be retained. PMA responded that it wished to build sixty homes on thirteen acres and sell the remaining thirty-seven acres for $1,250,000. Although the Township was willing to draft a resolution to put this to the planning process, the proposed zoning ordinance to permit the development was defeated. In addition, PMA had insisted upon an upset price of $3.5 million if the proposal fell through. (This was later reduced to $3.3 million.) The Township responded with a closed-session offer to purchase the property for $3.2 million in October 1990. A bond ordinance intended to finance the purchase failed two months later. Still, the developers continued to negotiate for more money and now sought, in addition to a $3.3 million purchase price, two years of rent at approximately $350,000 a year.

Again there was a new offer. In August 1991, the Township offered to acquire thirteen acres for $586,000 in consideration for the dismissal of the pending litigation between the parties, in which PMA had asserted a *de facto* taking. PMA counter-offered to sell thirteen acres for $800,000 if PMA could build thirty units on the remainder. The Township again counter-offered. In January 1992, the Township offered to purchase the entire fifty acres, but this time for $2,250,000. After several more months of exchange, the Township purchased the thirteen acres for $700,000. PMA's inverse condemnation action was dismissed with prejudice. Finally, in March 1993, the Township authorized the acquisition of the remaining thirty-seven acres. When PMA refused what turned out to be the final offer of $1,210,000 for the remaining

property in May 1993, the Township commenced the present condemnation action.

Throughout this tangled scenario of offer, counter-offer, reply offer and reply to reply offer, I am simply unable to find the kind of obstructive governmental action that "substantially affects" the use and enjoyment of the property. *N.J.S.A.* 20:3–30. It was a failed bargaining process, nothing more.

## II

The issue posed by this case is but one aspect of the larger problem posed by government precondemnation activities. For this analysis, I essentially restate a recent summary of the law. *See* S. Cary Gaylord & Lorena Hart Ludovici, *Condemnation Blight*, C730 ALI–ABA 189 (1992). Condemnation blight is a term

"applied somewhat imprecisely to the detrimental conditions that befall land slated for public acquisition. Either the project is undesirable and depresses values for some distance around its proposed boundaries, or, whatever the nature of the project, the affected land will surely be taken (or so the market believes) and hence, becomes virtually useless to the private sector of the market."

[*Condemnation Blight, supra,* C730 ALI–ABA at 191 (quoting Kanner, *Developments in Eminent Domain: A Candle in the Dark Corner of the Law,* 52 J. Urban L. 862, 891–92 (1975)).]

Usually, the signs of condemnation blight are apparent.

When rental property is involved, tenants vacate the premises either because of public announcements of the planned project or because government agencies directly notify tenants that condemnation is imminent and recommend that they leave. The vacant buildings fail to generate enough revenue to cover mortgage payments or property taxes thus exposing landowners to possible foreclosure. In addition, the empty buildings invite vandalism which hastens the physical deterioration of the area. Often the premises are in such a state of deterioration that buildings are boarded up and eventually torn down....

Vacant and residential properties are also vulnerable to the impact of condemnation blight. Ordinances may be passed which prohibit any new construction or development of the property which substantially impairs the value and marketability of vacant land. Residential property is affected by a decrease in city services such as street cleaning and refuse collection resulting in a slum appearance to the neighborhood. Police protection may be decreased, thus encouraging vandalism. In addition, piecemeal condemnation of various neighboring lands adds to the general deterioration of the whole neighborhood.... As a final blow to landown-

> ers, sometimes the governmental agency decides, after a period of years, that it
> does not need to condemn the parcel and allows the owner to remain in possession
> of his once valuable and now virtually worthless property. *See Washington
> Market Enters. v. City of Trenton,* 68 N.J. 107, 343 A.2d 408 (1975).
>
> [*Id.* at 191–92 (citations omitted).]

The effect of precondemnation activities is most stark in the context of developed rental properties. Because the delay between the initial actions and the actual taking can be substantial, in the interim the values of and interest in the property can plummet. Unease about the future has an impact upon a wide range of residential and business choices. "Tenants tend to move out, and new ones are hard to come by. This not only causes the landlord to lose rents but can lead to ... foreclosure.... Businesses also move out when they can to avoid the economic trauma of being displaced by the condemnation when it eventually comes." Gideon Kanner, *Condemnation Blight and Inverse Condemnation,* SB14 ALI–ABA 377, 382 (1996). A property owner confronted with such devastating consequences may institute an inverse condemnation action against the condemning authority to recover damages incurred for the loss of land value caused by the precondemnation activities. *Condemnation Blight, supra,* C730 ALI–ABA at 195. The New Jersey Eminent Domain Revision Commission also expressed its concerns over the type of situations in which precondemnation activities could have devastating effect upon rental properties.

> During [the precondemnation] period, the tenants, advised of the proposed taking,
> vacate. Vandalism occurs. Only speculators will purchase. In business areas, re-
> rentals are limited to tenants at greatly reduced rents. No one will equip or
> establish a new business in the area.... Tenants will vacate a large percentage of
> the property, and the income collected from the occupied portion [will be] rarely
> sufficient to pay carrying charges.
>
> [*Report of Eminent Domain Revision Commission* 25 (1965).]

In New Jersey, a compensable taking exists when the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of the property. *Washington Mkt., supra,* 68 *N.J.* at 122, 343 A.2d 408. In deciding whether a compensable taking claim arising out of precondemnation activities has been established, our courts weigh the following

factors: (1) extraordinary delay or other unreasonable conduct on the part of the condemning authority; (2) the imminence of condemnation; and (3) the severity of the injury and hardship to the property owner. *Littman v. Gimello,* 115 *N.J.* 154, 167–68, 557 *A.*2d 314 (1989). Balanced against these factors is the public interest in being informed of government activities, and in the benefits of the cautious and deliberate administration of the condemnation process. *Id.* at 168, 557 *A.*2d 314.

Initially, PMA sought the remedy of an inverse condemnation action. As noted from the procedural history cited by the majority, *ante* at 120, 695 *A.*2d at 1348, PMA instituted such an action in Superior Court in January 1991 for these precondemnation activities. That complaint was dismissed with prejudice. It is clear to me that that adjudication was on the merits, establishing that there was no taking as a result of the precondemnation activities. The case should have ended there.

As an alternative remedy to an inverse condemnation action, the property owner may wait until an eminent domain action is filed to present a claim for compensation by answer or counterclaim. Once the action is filed, the owner may seek an earlier date of valuation, from which to determine just compensation, or the owner instead may attempt to recover the lost value of the property as an element of damages caused by the cloud of blight hovering over the property.

Many jurisdictions now allow compensation based on the value of the property at the time of taking "as if it had not been subjected to the debilitating effect of the condemnation." *Condemnation Blight, supra,* C730 ALI–ABA at 208; *see City of Cleveland v. Carcione,* 118 *Ohio App.* 525, 190 *N.E.*2d 52 (1963) (determining jury should consider evidence of value from period prior to condemnor's actions); *Huntington Urban Renewal Auth. v. Commercial Adjunct Co.,* 161 *W.Va.* 360, 242 *S.E.*2d 562 (1978) (allowing owner to introduce evidence of precondemnation value to demonstrate decline in property value resulting from condemnor's actions).

Other courts have recognized that an award of compensation as of the time of formal taking may be unreasonable and unjust. In response, they have been willing to measure compensation at a date prior to a *de facto* taking. The Washington Supreme Court has adopted a four-part test to determine the date of valuation: (1) the marketability must be substantially impaired; (2) the condemning authority must have evidenced an unequivocal intention to take the property; (3) the special use of the land by the owner must be acquiring or holding the property for the subsequent development and sale; and (4) the owner must have taken active steps to accomplish this purpose. *Lange v. State*, 86 *Wash.*2d 585, 547 *P.*2d 282, 288 (1976). In such circumstances, compensation is measured at the time of the *de facto* taking.

The South Dakota Supreme Court considered the standards for evaluating a *de facto* taking. In *City of Brookings v. Mills*, 412 *N.W.*2d 497 (S.D.1987), the property owner claimed the city had effectively taken the property by delaying condemnation for over four years. The owner alleged that even prior to the condemnation, the City would have denied a permit based on its plans. The South Dakota court identified the elements of a *de facto* taking: (1) proof of direct and substantial government action; (2) causation; and (3) result. *Id.* at 500. To establish causation, the plaintiff must show that the actions of the condemning authority substantially contributed to and accelerated the decline in value of the plaintiff's property. *Id.* at 502. In PMA's case, the decline in value was due to general market conditions rather than the threat of condemnation. Causation does not include voluntary judgment decisions made by the owners themselves. *Id.* at 503. PMA's decision not to subdivide the land meets that definition. The kind of causation that results in a *de facto* taking is usually obvious. For example, *In re Elmwood Park Project Section 1, Group B* reviewed a twelve-year pattern of deliberate actions (such as eliminating public services) by the municipality to encourage the residents to move and concluded that "[i]f an area has been made a wasteland by the condemning authority, the property owner

should not be obliged to suffer the reduced value of [the] property." 376 *Mich.* 311, 136 *N.W.*2d 896, 900 (1965).

New Jersey law provides that the date of taking will be the earliest of the following events: (1) the date possession of the property being condemned is taken by the condemnor in whole or in part; (2) the date of the commencement of the action; (3) the date on which action is taken by the condemnor which substantially affects the use and enjoyment of the property by the condemnee; or (4) the date of a declaration of blight. *N.J.S.A.* 20:3–30. *New Jersey Sports and Exposition Authority v. Giant Realty Associates,* 143 *N.J.Super.* 338, 362 *A.*2d 1312 (Law Div.1976), represents an interpretation of the law that is consistent with nationwide precedent. The court reasoned that "[a] substantial effect upon the use and enjoyment of property is occasioned when the condemnor takes action that directly, unequivocally, and immediately stimulates an upward or downward fluctuation of value and which is directly attributable to future condemnation." *Id.* at 353, 362 *A.*2d 1312. No conduct of West Windsor "stimulated" the fluctuation in property values. The decline in property values in New Jersey was part of a nationwide trend.

In PMA's case, the Appellate Division correctly found that the July 1988 letter was nothing more than a "preliminary step to a potential future condemnation." The court also found that the Township's master plan made it "crystal clear" to PMA that their land was potentially subject to condemnation long before the July letter. *West Windsor v. Nierenberg,* 285 *N.J.Super.* 436, 450–51, 667 *A.*2d 362 (App.Div.1995). That the letter did not substantially affect the value is evident from the Green Acres Certification, which valued the property as it stood potentially capable of development.

The majority seems to wish to benefit property owners by giving to them a more flexible method of determining a valuation date. The thesis of the majority will come back to haunt property owners in a rising real estate market. Dating the valuation from the earlier date of interest will cause owners to lose property

value by the time the property is actually transferred to the public body.

The New York Court of Appeals once observed in similar circumstances:

> We simply have a manifestation of an intent to condemn and such, even considering the protracted delay attending the final appropriation, cannot cast the municipality in liability upon the theory of a "taking" for there was no appropriation of the property in its accepted legal sense....
>
> Moreover, strong public policy considerations prohibit a finding of a De facto taking in the instant case. To hold the date of the Announcement of the impending condemnation, whether directly to the condemnee or by the news media, constitutes a De facto taking at that time, would be to impose an "oppressive" and "unwarranted" burden upon the condemning authority. At the very least, it would serve to penalize the condemnor for providing appropriate advance notice to a property owner. And to so impede the actions of the municipality in preparing and publicizing plans for the good of the community, would be to encourage a converse policy of secrecy which would but raise (greater) havoc with an owner's rights.
>
> [*City of Buffalo v. J.W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895, 903–04 (1971) (internal quotations and citations omitted).]

So too here, rather than to discourage a policy of secrecy, the Court instead discourages municipalities from informing property owners about possible plans to acquire their property. All the evidence in this case shows that the negotiating process was open and above board. The minutes of the confidential sessions of the governing body demonstrate full and frank discussions of the acquisition. It is not easy to spend three million dollars of the municipal taxpayers' money for the acquisition of property. (Green Acres funds were insufficient to pay for the acquisition.) Despite the best of intentions, the Township had many problems in persuading the voters that the acquisition and proposed zoning changes were in the public interest. That it wanted to acquire the land is not enough to demonstrate a substantial interference with the use and enjoyment of the property. *Cf. Washington Market, supra,* 68 N.J. at 123–24, 343 A.2d 408 (remanding for showing of substantial destruction of value as a result of condemnor's actions). This is not a case in which the Township Committee directed the Planning Board not to issue permits for the property. Nor is it a situation of a developed rental property.

Defendants knew from the beginning that this property had been designated for park purposes. Yvette Nierenberg is not the "proverbial little old lady" who lives on a farm and is hounded by public officials. *See World–Wide Volkswagen Corp. v. Woodson,* 444 *U.S.* 286, 318, 100 *S.Ct.* 559, 571, 62 *L.Ed.*2d 490, 515 (1980) (Blackmun, J., concurring). Yvette Nierenberg entered a sophisticated land transaction with an experienced developer. The PMA partners, knowing of its designation as a park, said to themselves, "Let's try to develop the land." They entered a sale contingent upon subdivision approvals. They also entered a sale contingent upon condemnation. The contract between Nierenberg and Kramer expressly provided for what would happen in the event of a condemnation. Kramer could either pull out of the transaction or continue with the transaction and have the partnership receive, after closing the deal, any award resulting from condemnation of the property. If Mrs. Nierenberg had not entered this relationship with Mr. Kramer, she would never have had the benefit of the second-tier valuation assigned to the property. By entering the contract, she achieved her basic goal and demonstrated that this land was more than raw land. Foresight is never as accurate as hindsight. The PMA partners should not be able to burden the taxpayers of West Windsor with the risk of a declining real estate market that they took when they turned down a $3,000,000 offer.

For the foregoing reasons, I would affirm the decision of the Appellate Division.

Chief Justice PORITZ and Justice HANDLER join in this opinion.

*For reversal and remandment*—Justices POLLOCK, GARIBALDI, STEIN and COLEMAN—4.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER and O'HERN—3.